Argued and submitted July 8, 2010, general judgment reversed and remanded
with instructions to enter judgment reducing plaintiffs' award of noneconomic
damages to $500,000, otherwise affirmed; supplemental judgment reversed
and remanded September 21, 2011, petition for review allowed
March 8, 2012 (351 Or 649)

Bobbi KLUTSCHKOWSKI
and Kevin Klutschkowski,
personally and as guardians ad litem for
Braedon Klutschkowski,
a minor child,
*Plaintiffs-Respondents,*

*v.*

PEACEHEALTH,
*Defendant,*

*and*

OREGON MEDICAL GROUP, P.C.;
Amy McCarthy;
Center For Women's Health, P.C.;
Zena I. Monji; and Zena I. Monji, M.D., P.C.,
*Defendants-Appellants.*

Lane County Circuit Court
160615518; A138722

263 P3d 1130

Janet M. Schroer and Matthew J. Kalmanson argued the cause for appellants. With them on the briefs were Marjorie A. Speirs and Hoffman Hart & Wagner LLP.

Richard M. Rogers argued the cause for respondents. With him on the brief were Patrick L. Block and Rogers & Block, LLP.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

HASELTON, P. J.

### HASELTON, P. J.

Defendant Oregon Medical Group, P.C. (OMG) appeals a general judgment entered on a jury verdict in favor of plaintiffs Bobbi and Kevin Klutschkowski and their son Braedon Klutschkowski in this medical negligence action arising from the circumstances of Braedon's birth and a supplemental judgment awarding plaintiffs their costs and disbursements.[1] On appeal, OMG contends, *inter alia*, that the trial court erred in (1) denying its motion for a directed verdict and instructing the jury on plaintiffs' "informed consent claim"; (2) denying its motion to reduce the jury's award of noneconomic damages to $500,000 because application of the statutory cap—ORS 31.710—to plaintiffs' claim for prenatal injuries does not violate the remedy clause and jury trial provisions of the Oregon Constitution; and (3) awarding plaintiffs, as the prevailing party, their costs in preparing trial transcripts under ORS 21.470(5). As amplified below, we reject OMG's challenge to the trial court's denial of its motion for a directed verdict because OMG failed to demonstrate that it was prejudiced by the ruling and conclude that its challenge to the trial court's jury instruction concerning informed consent is unreviewable. Further, we conclude that the trial court erred in denying OMG's motion to reduce the jury's award of noneconomic damages and in awarding plaintiffs the cost of preparing daily trial transcripts. Accordingly, we reverse the general and supplemental judgments, in part, and remand for further proceedings.

Consistently with our standard in reviewing the denial of a motion for directed verdict, we view the evidence,

---

[1] In addition to defendant OMG, other defendants are designated as appellants in the notice of appeal—*viz.*, (1) Amy McCarthy; (2) Center for Women's Health, P.C.; (3) Zena I. Monji; and (4) Zena I. Monji, M.D., P.C. However, in the opening brief, their attorney indicated that they were named "as appellants * * * as a precaution" and that they "do not assert arguments on appeal." Relatedly, although PeaceHealth was a defendant in the trial court, it is not a party to this appeal. For clarity and convenience, throughout this opinion, we refer to each defendant by name.

Further, as indicated above, plaintiffs are Bobbi and Kevin Klutschkowski and their son, Braedon. Bobbi and Kevin appear personally and as guardians *ad litem* for Braedon. For clarity and convenience, throughout this opinion, we refer to Bobbi, Kevin, and Braedon Klutschkowski collectively as "plaintiffs" and individually by their respective first names.

including any inferences, in the light most favorable to the nonmoving party, here, plaintiffs. *Hudjohn v. S&G Machinery Co.*, 200 Or App 340, 342, 114 P3d 1141 (2005). In general terms, this negligence case concerns alleged complications arising from Braedon's birth by vaginal delivery and Braedon's alleged resultant injuries. To provide essential context, before turning to the particular facts, we begin by briefly describing a delivery complication that is at the heart of the dispute—*viz.*, a shoulder dystocia.

A shoulder dystocia occurs when a baby's shoulder becomes stuck behind the mother's pubic bone. Generally, once a shoulder becomes stuck, doctors use obstetric maneuvers to attempt to facilitate the baby's delivery. Two such maneuvers are (1) the McRoberts maneuver, which involves flexing the mother's hips to change the angle of the pubic bone by bringing her legs back up against her chest, and (2) the Woods corkscrew maneuver, which involves the doctor placing his or her hands inside the mother's vagina on the baby's shoulders and turning or rotating the baby 180 degrees.

When a shoulder dystocia occurs, the baby is at risk of suffering a variety of injuries, including death. A brachial plexus injury is one of the most common and serious injuries that occurs with a shoulder dystocia.[2] Here, it is undisputed that Braedon has a brachial plexus injury.

Based on expert testimony at trial, a shoulder dystocia occurs approximately once in every 100 births. Of that group of children who experience a shoulder dystocia during delivery, 15 percent will suffer a brachial plexus injury, and, of that group, 10 to 15 percent will have a permanent injury. Significantly, for purposes of this case, once a shoulder dystocia occurs during a delivery, there is a significantly higher risk that a shoulder dystocia will occur in subsequent deliveries involving the same mother.

For those reasons, the standard of care in the medical profession requires that a doctor inform a mother who has

---

[2] The brachial plexus is a set of nerves that emerges from the cervical spine or neck and controls the movement of a person's shoulder, arm, wrist, hand, and fingers. Stretching or tearing of the brachial plexus can lead to paralysis.

had a previous shoulder dystocia of the increased risk of a subsequent shoulder dystocia and a brachial plexus injury to the baby occurring during a vaginal delivery and advise her to consider a cesarean section to reduce or avoid those risks. With that context in mind, we turn to the historic facts of this case.

On March 3, 1999, Bobbi, who was a patient of OMG, gave birth to her third child, Anna. Bobbi delivered Anna vaginally. Although Anna was unharmed, the delivery was complicated by a shoulder dystocia. Significantly, the doctor who delivered Anna specifically noted, in his report, that "[t]here was a shoulder dystocia managed by shoulder rotation maneuver with the patient's hips in a flexed position." However, the doctor did not tell Bobbi about the shoulder dystocia, and Bobbi was unaware that a complication had occurred during the delivery.

Several years later, in 2002, Bobbi and Kevin married. Thereafter, in the spring of 2003, Bobbi became pregnant, and she scheduled an appointment with OMG in June. Because the doctor who had previously delivered her other children had since moved, Bobbi was scheduled to see Dr. Amy McCarthy, an obstetrician and employee of OMG.

In preparation for that appointment, Laura Carpenter, a medical assistant, reviewed OMG's medical records. Significantly, based on the doctor's report concerning Anna's delivery, Carpenter noted on the current pregnancy record that Anna's delivery had been complicated by a shoulder dystocia.

Soon after Bobbi arrived for her appointment, however, an ultrasound confirmed that Bobbi had suffered a miscarriage. Accordingly, Dr. McCarthy did not address potential obstetrical complications with Bobbi. Nevertheless, following the appointment, Dr. McCarthy dictated a report, noting, as part of Bobbi's past medical history, the shoulder dystocia that had occurred during Anna's delivery.

A few months later, Bobbi became pregnant with Braedon, and, in early October, she scheduled an appointment with Dr. McCarthy. Rebecca Manwill, a medical

assistant, completed a new pregnancy record.[3] Unlike Carpenter, who reviewed OMG's medical records for information about Bobbi's prior pregnancies, Manwill obtained that information from Bobbi, who, as previously noted, was unaware that a complication had occurred during Anna's delivery. In sum, the pregnancy record did not indicate that one of Bobbi's previous deliveries had been complicated by a shoulder dystocia.

Following that initial appointment in October, Dr. McCarthy managed Bobbi's pregnancy. On April 16, 2004, Dr. McCarthy determined that Braedon's size was large for his gestational age, and she ordered an ultrasound for further evaluation. Thereafter, on April 20, before the ultrasound was completed, OMG sent the current pregnancy record to the hospital at which Bobbi planned to deliver.

Three days later, on April 23, an ultrasound confirmed Dr. McCarthy's determination about Braedon's size. Specifically, the ultrasound indicated that his weight was approximately 3,964 grams, which was greater than the 97th percentile for babies of his gestational age.[4] Because of Braedon's size, Dr. McCarthy believed that Bobbi "had a risk for a shoulder dystocia" during delivery and, on April 29, she and Bobbi discussed inducing labor. Ultimately, Dr. McCarthy scheduled an induction for early May.

According to Dr. McCarthy, she had "forgotten about the documentation" in OMG's records—including her own notation in the June 2003 report—concerning a shoulder dystocia during Anna's delivery. Instead, Dr. McCarthy relied on the current pregnancy record and Bobbi's statements concerning her previous pregnancies, neither of which indicated that a prior shoulder dystocia had occurred. For that reason, in their discussions on April 29, Dr. McCarthy did not inform Bobbi that there was an increased risk of a repeat shoulder

---

[3] Our understanding is that a separate record is created for each pregnancy.

[4] The results of the ultrasound were placed in OMG's records; however, they were not sent to the hospital.

dystocia and brachial plexus injury occurring during a vaginal delivery and that, to avoid those risks, she should consider a cesarean section. Had Bobbi been informed of those risks and the alternative of a cesarean section, she would have chosen to have a cesarean section.

On May 2, the day before the scheduled induction, Bobbi went into labor. Dr. Zena Monji, an obstetrician and employee of OMG, was on call that day. Dr. Monji reviewed Bobbi's pregnancy record, but, as noted, it did not include any reference to a previous shoulder dystocia or the results of the ultrasound, which indicated that Braedon was large for his gestational age. Dr. Monji testified that had she known about the prior shoulder dystocia and the results of the ultrasound, consistently with the standard of care, she would have informed Bobbi that there was an increased risk of a repeat shoulder dystocia and a brachial plexus injury and would have advised her to consider a cesarean section.

Ultimately, Bobbi delivered Braedon vaginally. As had previously occurred when Bobbi delivered Anna, a shoulder dystocia occurred during Braedon's delivery. Although Dr. Monji's report referred to a "[n]ormal spontaneous vaginal birth" and did not expressly refer to a shoulder dystocia, she noted that the "[s]houlders and body were delivered with a modified McRoberts maneuver."[5] When Bobbi saw Braedon following his delivery, his right arm was bruised and discolored, and, although he was moving his left arm, his right arm "just laid there."

Ultimately, Braedon was diagnosed with a permanent, disabling brachial plexus injury that occurred during his vaginal delivery and that would have been avoided had a cesarean section been performed. Specifically, Braedon's right arm is physically deformed, and he suffers from reduced strength and reduced and abnormal movement and function.

---

[5] One of plaintiffs' experts, Dr. Thomas Thornton, a board-certified obstetrician, testified that, as of 2002, the American College of Obstetricians and Gynecologists, defined a shoulder dystocia as "a delivery that requires * * * one or more added obstetrical maneuvers in addition to this simple traction on the baby's head." As previously noted, 245 Or App at 527, the "McRoberts maneuver" is one obstetrical maneuver used to resolve a shoulder dystocia.

Braedon's injury will adversely affect his ability to perform activities of daily living (*e.g.*, reaching and removing something from a cupboard, placing his suitcase in the overhead compartment of an airplane, typing, walking on a slippery sidewalk due to his abnormal gait, and dressing). Further, Braedon's injury will affect his employability and earning capacity. Specifically, Judith Parker, a vocational rehabilitation specialist, testified that Braedon's "future wage earning capacity will likely be impaired by as much as 25% in consideration of the seriousness of his physical impairment."

In 2006, plaintiffs filed this action for damages against OMG, as well as a variety of other entities and individuals. *See* 245 Or App at 526 n 1. Thereafter, they amended their complaint several times. Ultimately, the third amended complaint alleged claims against OMG, Dr. McCarthy, and Dr. Monji.[6] However, the day before trial, plaintiffs dismissed both Dr. McCarthy and Dr. Monji and the allegations of negligence against them, as well as several of the specifications of negligence against OMG—the only remaining defendant.

As pertinent to the issues on appeal, the operative complaint alleged a claim for negligence in paragraph 5. Specifically, paragraph 5 alleged that "OMG was negligent in one or more of the following respects:"

"(d)   In failing to inform Bobbi[ ] Klutschkowski that the occurrence of shoulder dystocia in the March 3, 1999, delivery and the fetal size determination by Dr. McCarthy and by the April 23, 2004, ultrasound increased the risk of shoulder dystocia occurring in a vaginal delivery of Braedon Klutschkowski;

"(e)   In failing to inform Bobbi[ ] Klutschkowski that there was increased risk of Braedon Klutschkowski suffering a brachial plexus injury if shoulder dystocia occurred during his delivery;

"(f)   In failing to offer Bobbi[ ] Klutschkowski the option of a C-section as an alternative to a vaginal delivery of Braedon Klutschkowski;

---

[6] By that point, the other defendants had been dismissed from the case.

"(g)   In failing to document in Bobbi[ ] Klutschkowski's pregnancy record for her pregnancy with Braedon Klutschkowski the occurrence of shoulder dystocia during the March 3, 1999, delivery;

"(h)   In failing to inform Dr. Monji of the occurrence of the shoulder dystocia in Bobbi Klutschkowski's March 3, 1999, delivery, of Dr. McCarthy's assessment of Braedon's fetal size as large for gestational age and of the April 23, 2004, ultrasound documentation of an estimated fetal weight of 3,964 [grams] and greater than the 97th percentile[.]"

Further, in a separate paragraph—paragraph 8—plaintiffs alleged that OMG "did not obtain Bobbi Klutschkowski's informed consent to deliver Braedon Klutschkowski vaginally rather than by cesarean section."

As framed by those allegations, the parties' competing theories of the case hinged, as a practical matter, on a single, factual question: Did a shoulder dystocia occur during Anna's delivery in 1999? In turn, each party's respective answer to that question ultimately dictated a different standard of care.

Plaintiffs' theory was straightforward. Essentially, they contended that, because a shoulder dystocia occurred when Anna was delivered, the standard of care required that OMG (1) inform Bobbi of the increased risk of a subsequent shoulder dystocia and a brachial plexus injury occurring during a vaginal delivery and (2) advise her to consider a cesarean section to reduce or avoid those risks.

Conversely, OMG presented expert testimony to support its contention that, although a shoulder dystocia had been documented in connection with Anna's delivery, that complication had actually *not* occurred—and, thus, there was no reason for Bobbi to have been informed of an increased risk of a repeat shoulder dystocia and a brachial plexus injury occurring during a vaginal delivery and advised to consider a cesarean section. In sum, OMG proffered evidence that no shoulder dystocia had occurred in 1999 and that, in the absence of an *actual* prior shoulder dystocia, there was no violation of the standard of care in this case.[7]

---

[7] Consistently with Dr. McCarthy's and Dr. Monji's testimony, one of OMG's experts also testified that, if a prior shoulder dystocia had occurred and Bobbi had

The juxtaposition of those competing theories became acute toward the end of trial, when the court ruled on several reserved motions, including OMG's motion for a directed verdict, and finalized the jury instructions. The court's decisions as to those issues reflected its understanding of how the parties had, in presenting their evidence, framed the case for the jury's consideration.

The court began by ruling on OMG's motion for a directed verdict as to what OMG referred to as plaintiffs' statutory informed consent "claim" under ORS 677.097[8]— that is, the allegation in paragraph 8 that OMG "did not obtain Bobbi Klutschkowski's informed consent to deliver Braedon Klutschkowski vaginally rather than by cesarean section." As pertinent to the issues on appeal, OMG contended that

"[i]nformed consent is not necessary where there is no 'medical procedure or treatment' involved. ORS 677.097. Vaginal child birth is a naturally occurring event that could never be included within the definition of a 'medical procedure.' Whether or not an expectant mother 'consents' to a vaginal delivery, the event will occur without physician intervention."

_____

not been informed about the risks of and alternatives to delivering Braedon vaginally in light of that occurrence, the standard of care had *not* been met in this case.

[8] ORS 677.097 provides:

"(1) In order to obtain the informed consent of a patient, a physician or podiatric physician and surgeon shall explain the following:

"(a) In general terms the procedure or treatment to be undertaken;

"(b) That there may be alternative procedures or methods of treatment, if any; and

"(c) That there are risks, if any, to the procedure or treatment.

"(2) After giving the explanation specified in subsection (1) of this section, the physician or podiatric physician and surgeon shall ask the patient if the patient wants a more detailed explanation. If the patient requests further explanation, the physician or podiatric physician and surgeon shall disclose in substantial detail the procedure, the viable alternatives and the material risks unless to do so would be materially detrimental to the patient. In determining that further explanation would be materially detrimental the physician or podiatric physician and surgeon shall give due consideration to the standards of practice of reasonable medical or podiatric practitioners in the same or a similar community under the same or similar circumstances."

Stated differently, in moving for a directed verdict, OMG's position was that a physician need not obtain informed consent for *any* vaginal delivery because a vaginal delivery is not a "procedure or treatment" as contemplated by ORS 677.097. The court denied that motion without amplification.

Although OMG's motion for a directed verdict framed a purely legal issue, as previously described, 245 Or App at 532, the parties' competing theories concerned whether *the facts of this case* required OMG to inform Bobbi about risks of and alternatives to delivering Braedon vaginally. The court focused on those theories as it finalized the jury instructions. Of significance, the court understood that whether informed consent was required in this case was a jury question—an understanding with which OMG's counsel agreed.[9]

---

[9] As described more fully below, 245 Or App at 543, there were, over time, approximately 18 different iterations of the jury instructions prepared by the court in this case. One of the preliminary versions of the informed consent instruction apparently contained a statement, requested by plaintiffs, that OMG was required to obtain Bobbi's informed consent to a vaginal delivery. During discussions of that language—which did not appear in the final version of the instruction—the following exchange occurred between the court and defense counsel:

"THE COURT: So, you don't think there are circumstances under which, for example, like this case, where one might argue, no, the duty is such, under these facts, that informed consent was required.

"[DEFENSE COUNSEL]: I guess I'm not—

"THE COURT: Well, one of your experts testified over rather strenuous objection by [plaintiffs' counsel] that this was not a situation in which informed consent was required.

"[DEFENSE COUNSEL]: Yes. True.

"THE COURT: Which impliedly means to me that there could be situations in which it was.

"[DEFENSE COUNSEL]: Well, I guess you would have to imply that. But I don't think that you can.

"THE COURT: Well, I think obviously on this record, one could at least argue when to imply that, since most of [plaintiffs' evidence] said that it was a situation where informed consent was required. So I'm struggling with, given that problem, where you're saying this isn't an informed consent case at all, and [plaintiffs' counsel] is saying it's not only informed consent, but as a matter of law, it was required, it wasn't given, and I ought to win on that issue outright—if you take vaginal delivery as a default position, but not automatically assume that therefore there's no informed consent required, nor automatically assume that it must be required, then is the determination of the duty not the jury's?

"[DEFENSE COUNSEL]: It's the jury's. It's the jury's determination."

Ultimately, the court instructed the jury that plaintiffs had raised five specific allegations of negligence and then essentially recited verbatim the specifications set out in paragraph 5 of plaintiffs' complaint. *See* 245 Or App at 531-32 (quoting plaintiffs' allegations of negligence). With regard to informed consent, the trial court gave the following instructions:

> "To obtain the informed consent of a patient, a physician must explain the following: One, in general terms, the procedure or treatment to be undertaken; two, that there may be alternative procedures or methods of treatment, if any; and, three, that there are risks, if any, of the procedure or treatment.
>
> " 'Explain' means to make plain or understandable, clear of complexities or obscurities.
>
> "After giving that explanation, the physician must ask the patient if the patient wants a more detailed explanation. If the patient requests further explanation, the physician must then disclose, in substantial detail, the procedure, the viable alternatives, and material risks of the procedure.
>
> "A risk of procedure or treatment is material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk alone or in combination with other risks in deciding whether or not to undergo the procedure or treatment.
>
> "*A failure to obtain [Bobbi's] informed consent may be considered by you in determining whether or not [OMG] was negligent.*
>
> "*In order to find [OMG] negligent in failing to provide informed consent,* you must determine that [Bobbi] would not have consented to a vaginal delivery had all the risks and alternatives you find to be material been disclosed to her."

(Emphasis added.)

Thereafter, the jury returned a general verdict, finding that OMG had been negligent. Specifically, the verdict form, as completed by the jury, provided:

"We, the jury, find:

"1. Was [OMG] *negligent* in one or more of the ways alleged by plaintiffs, and, if so, was such *negligence* a cause of damage to plaintiffs?

"ANSWER:   YES (Yes or No)

"If your answer to Question 1 is 'No,' your verdict is for [OMG]. Your presiding juror should sign this Verdict. Do not answer any more questions.

"If your answer to Question 1 is 'Yes,' proceed to Question No. 2. At least the same nine of you who answered 'Yes' to Question 1 must agree on the answer to Question No. 2.

"2. What are plaintiffs' damages?

"Economic Damages   $557,881.11

"Non-economic Damages   $1,375,000.00"

(Emphasis added.)

In response to the verdict, OMG filed a motion to reduce plaintiffs' award of noneconomic damages to $500,000, pursuant to ORS 31.710, the statutory cap on noneconomic damages.[10] OMG contended that, because a claim for prenatal injuries did not exist in 1857 when the Oregon Constitution was adopted, the $500,000 cap applied without violating either the remedy clause of Article I, section 10, or the jury trial provisions of Article VII (Amended), section 3, and Article I, section 17. Conversely, plaintiffs contended that the application of ORS 31.710 in the circumstances of this case violated the remedy clause because plaintiffs' claim was not a claim for prenatal injuries but, rather, a common-law negligence claim. Again without elaboration, the trial court denied OMG's motion and entered a general judgment consistent with the jury's verdict. OMG timely appealed that judgment.

Plaintiffs then sought to recover certain costs and disbursements. As pertinent to the issues raised on appeal, plaintiffs, relying on ORS 21.470(5), sought $5,184.75 for "[h]earing transcript and trial transcript fees" incurred during trial. OMG objected. According to OMG, "ORS 21.470

---

[10] The text of the statute is set out below at 245 Or App at 544.

applies only to costs for preparing transcripts on appeal, not for transcripts obtained during trial." The court rejected OMG's argument and entered a supplemental judgment awarding plaintiffs costs, including the disputed transcript costs. OMG then filed an amended notice of appeal from the supplemental judgment.

On appeal, OMG raises six assignments of error. We reject without discussion OMG's third and fourth assignments of error concerning one aspect of the trial court's jury instructions and the court's failure "to direct a verdict on [OMG's] vicarious liability based on conduct by Dr. Monji." We address the remaining assignments of error in turn.

We begin with OMG's first and second assignments of error concerning, respectively, the trial court's denial of OMG's motion for a directed verdict and the jury instructions pertaining to OMG on plaintiffs' informed consent "claim." In those interrelated assignments, OMG contends that

"the trial court erred when it denied [OMG's] motion for a directed verdict and instructed the jury on plaintiffs' informed consent claim. The allegations and evidence in this case describe a breach of a standard of care claim based on Dr. McCarthy's purported failure to investigate [Bobbi's] previous pregnancies and then appropriately advise her based on her medical history; this case has nothing to do with ORS 677.097 or 'informed consent.' A vaginal delivery is not a 'procedure or treatment' from which a woman can withhold consent. Because the court's instruction permitted the jury to find [OMG] liable on an impermissible ground, a new trial is warranted."

As explained below, we need not resolve the merits of OMG's assignment of error concerning the denial of its motion for a directed verdict on plaintiffs' informed consent "claim" because, even if the trial court erred, OMG has not demonstrated that it was prejudiced by any error in that regard. Further, we reject as unreviewable OMG's challenge to the jury instructions concerning informed consent because OMG's present contention was unpreserved.

We turn first to the assignment of error concerning the trial court's denial of OMG's motion for a directed verdict.

Pursuant to ORS 19.415(2), we may reverse or modify a judgment only if there is an error that "substantially affect[s] the rights of a party." In *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 173-74, 61 P3d 928 (2003), the Supreme Court explained:

> "The possibility that an error might have resulted in a different jury verdict is insufficient under the statute. Instead, the court must be able to conclude, from the record, that the error 'substantially affect[ed]' the rights of the losing party. Moreover, the statute protects the trial court judgment from reversal or modification 'except for' error substantially affecting a party's rights, indicating that reversal of a judgment is the exception, not the rule. The rule embodied in ORS 19.415(2) is neutral as between plaintiffs and defendants; it places the burden to make a record that demonstrates prejudicial error on whichever party loses in the trial court and then seeks reversal or modification of the judgment on appeal."

(Brackets in *Shoup*.) Accordingly, the Supreme Court reasoned that, "in a case involving a judgment on a general verdict based on multiple specifications [of negligence], one of which is invalid," the verdict will be sustained on appeal "if there is evidence to support another, valid specification." *Id.* at 176.

*Shoup* is dispositive of OMG's first assignment of error. Here, in framing the case for the jury, the trial court and the parties treated the informed consent allegation in paragraph 8—that is, that OMG "did not obtain Bobbi Klutschkowski's informed consent to deliver Braedon Klutschkowski vaginally rather than by cesarean section"—as a specification of negligence. Our determination in that regard is predicated on two salient observations.

First, the court's jury instructions treated OMG's alleged failure to obtain informed consent as a specification of negligence. In particular, the court told the jury that "[a] failure to obtain [Bobbi's] informed consent may be considered by you in determining whether or not [OMG] was *negligent*" and that, "[*i*]*n order to find [OMG] negligent in failing to provide informed consent*, you must determine that [Bobbi] would not have consented to a vaginal delivery had all the

risks and alternatives you find to be material been disclosed to her." (Emphasis added.)

Second, in discussing the general verdict form, the trial court noted that "informed consent [was] part and parcel of the specifications of negligence as set out in the jury instructions" and was "not a separate question." Consistently with that understanding, the general verdict form presented a single question to the jury: "Was [OMG] *negligent* in one or more of the ways alleged by plaintiffs, and, if so, was such *negligence* a cause of damage to plaintiffs?" (Emphasis added.) Stated differently, by its express terms, the verdict form presented only one claim for the jury's consideration—*viz.*, a claim for negligence.[11]

With the function of paragraph 8 as a specification of negligence so understood, *Shoup*'s application is patent. Here, apart from the allegation in paragraph 8, there were additional specifications of negligence alleged in paragraph 5. On appeal, OMG does not contend that those additional specifications were invalid or that there was insufficient evidence to support them. As noted, because the jury in this case returned a general verdict, we cannot determine the rationale for its ultimate determination of negligence. Accordingly, because the verdict might have been based on one or more specifications independent of the informed consent allegation in paragraph 8, OMG failed to demonstrate that it was prejudiced by the court's denial of its motion for a directed verdict and the subsequent submission of the specification in paragraph 8 to the jury. *See Shoup*, 335 Or at 176. We thus reject the first assignment of error.

Having rejected OMG's contention concerning the trial court's denial of its motion for a directed verdict, we turn to OMG's related contention pertaining to the court's jury instructions concerning informed consent. OMG posits that, because a vaginal delivery is not a "procedure or treatment"

---

[11] In addition, we note that OMG asserts that the allegation in paragraph 8 should be treated as a distinct, statutory claim for informed consent rather than a specification of negligence. Even if OMG's characterization of paragraph 8 were correct, it would not be entitled to relief because, as the verdict form indicates, a distinct claim for informed consent was never submitted to the jury. Accordingly, OMG could not have been prejudiced by any error in denying its motion for a directed verdict as to that claim. *See* ORS 19.415(2).

for purposes of ORS 677.097, the court's instruction "permitted the jury to find [OMG] liable on an impermissible ground" and, as such, was legally erroneous. Again—albeit for very different reasons than pertained to the first assignment of error—OMG's present challenge to the informed consent instruction is unreviewable.

ORCP 59 H prescribes the requisites of preserving an appellate challenge to purported instructional error. Specifically, ORCP 59 H(1) provides that

"[a] party may not obtain review on appeal of an asserted error by a trial court * * * in giving or refusing to give an instruction to a jury unless the party who seeks to appeal identified the asserted error to the trial court and made a notation of exception immediately after the court instructed the jury."

Further, such exceptions shall be "state[d] with particularity." ORCP 59 H(2).

Since the amendment of ORCP 59 H in 2004, we have rigorously—some might think ruthlessly—enforced its requirement that an exception be taken after the jury has been instructed.[12] And we have done so even when it has been apparent that the court and parties engaged in substantial preinstructional colloquy regarding the disputed instruction.[13] Further, in construing and applying the rule's "with particularity" requirement, we have, on one occasion, deemed a brief post-instructional exception that explicitly referred to, and incorporated by reference, the preinstructional colloquy to be sufficient. See Deason v. TriMet, 241 Or

---

[12] See, e.g., State v. Guardipee, 239 Or App 44, 47, 243 P3d 149 (2010) (noting that ORCP 59 H's requirement that an exception be taken immediately after the jury is instructed "is explicit and unambiguous"; holding that, "[b]ecause defense counsel failed to make a notation of exception immediately after the court instructed the jury, the matter was not preserved for our review" (internal quotation marks omitted)); Cestaro v. State of Oregon, 229 Or App 8, 14, 209 P3d 851 (2009) ("ORCP 59 H is very clear in its requirement that, for this court to review on appeal any asserted error in a jury instruction, the party asserting the error must have taken exception to the instruction, either orally or in writing, immediately after the jury was instructed." (Emphasis in original.)).

[13] See Cestaro, 229 Or App at 14 ("Plaintiff's argument to the trial court prior to the giving of the jury instruction that the conclusion underlying the court's decision to give the instruction was factually incorrect was insufficient pursuant to ORCP 59 H to preserve any of the arguments he now makes on appeal in support of his claim of error.").

App 510, 514 n 2, 251 P3d 779 (2011). However, we did so only where the preinstructional colloquy pertained directly to the disputed instruction in the form in which it was ultimately, actually given.

Specifically, in *Deason*,

"before the jury was instructed * * *, the court informed the parties that it intended to give the jury the duty-to-assist instruction. Plaintiff asked to be heard on the issue and made extensive argument to the court.

"After hearing argument, the court noted plaintiff's objection for the record but stated that it was 'going to include the instruction as written.' Thereafter, the court gave the duty-to-assist instruction. After the jury was charged, plaintiff took exception 'to the special—or the addendum or the second part of the Special Duty instruction for the reasons that I've already advanced to the Court, and I do think it was crucially important.' "

*Id.* Under those circumstances—in which the exception referred to extensive arguments to the trial court concerning the instruction that was ultimately given—we concluded that the "[p]laintiff's exception to the instruction after the jury was charged, that referred the court to the extensive argument on the record, was clearly sufficient to satisfy the requirements of ORCP 59 H." *Id.*

With those principles in mind, we return to the circumstances of this case. In considering those circumstances, it is essential to reiterate and remember that OMG's present challenge to the informed consent instruction is that *no* instruction on informed consent should have been given because, as a matter of law, informed consent was inapposite. Here, the jury instructions generally—and the informed consent instruction specifically—evolved during the course of the trial, with the court preparing approximately 18 proposed drafts, *none of which is in the record.* Two days before the jury was actually instructed, the court indicated that the parties' arguments concerning the jury instructions had been sufficient to alert it to their concerns.[14]

---

[14] Specifically, the court said:

"I'm going to ask for exceptions after I instruct, and if you want to just be extra careful with your record, you can do that, but * * * I'm going to tell you now that any disagreement you have on the record or any disagreement you have by

Nevertheless, on the day that the jury was instructed, the court began the proceeding by asking the parties whether they had exceptions to the *final* version of the instructions. OMG, incorporating the "points that [it] raised during the discussions initially about jury instructions," excepted to the final paragraph of the informed consent instruction, which, as previously described, stated:

> "In order to find [OMG] negligent in failing to provide informed consent, you must determine that [Bobbi] *would not have consented to a vaginal delivery* had all the risks and alternatives you find to be material been disclosed to her."

(Emphasis added.) OMG noted that that paragraph continued to contain "a reference to Mrs. Klutschkowski having consented to a vaginal delivery"—and suggested that the italicized phrase above should be replaced with the phrase "would have opted for a Cesarean section."

Thereafter, the court gave the informed consent instruction described above. *See* 245 Or App at 535 (quoting the entire informed consent instruction). Again, after the jury was instructed, the court, noting that the previously made exceptions were "taken as given," asked defense counsel whether he had any further exceptions. Defense counsel's only response concerned the definition of the term "explain," which counsel believed had been omitted from the instruction.

In sum, after the jury was instructed, OMG took exception to a single aspect of the informed consent instruction—that is, the purported omission of the definition of the term "explain." Further, to the extent that, under *Deason*, OMG could properly incorporate exceptions taken to the *final version* of the instruction before it was actually given, OMG's only expressed objection at that point was to the use of the

virtue of an instruction you offered the court that I haven't given, I will take that right now as an exception, and I don't feel the need to add to that.

"The purpose of the change in the rule is to articulate the reason that might change my mind. And I spent a couple weeks thinking about these things, and I know that the three of you have spent far more than a couple weeks thinking about these. So I think we've had pretty full discussion, and I'm comfortable with that discussion, and I'm comfortable with your record."

phrase "would not have consented to a vaginal delivery" instead of "would have opted for a Cesarean section."

On appeal, OMG does not reiterate either of its contemporaneous challenges to the informed consent instruction as actually given. Instead, as noted, it now raises a qualitatively different exception—*viz.*, that informed consent was inapposite as a matter of law. We reject that challenge as unreviewable for any of three independently sufficient reasons.

*First*, even under *Deason*'s benign incorporation-by-reference construction of ORCP 59 H(2)'s "with particularity" requirement, the referent is the preinstructional colloquy relating to the disputed instruction, in its final form, as it was actually given. As noted, OMG's present challenge was not expressed even in that referent colloquy.

*Second*, to the extent that OMG would have us, notwithstanding *Deason*, refer to any discussions antedating the ultimate colloquy, the record in that regard defies review. As noted, there were approximately 18 different iterations of the proposed instructions, none of which (except the last) is part of our record. Reading those transcribed discussions is akin to reading critical reviews of a book, without the book—or, even more, criticisms of a series of drafts without each draft. Further, because the instructions were a "moving target," objections that pertained to one version might not pertain to a subsequent version.[15]

*Third*, as previously explained, the parties' competing theories concerned whether *the particular facts of this case* required OMG to inform Bobbi about risks of and alternatives to delivering Braedon vaginally. For that reason, the trial court understood that whether informed consent was required in this case was a jury question, and defense counsel agreed. Accordingly, OMG's contrary appellate contention—*viz.*, that *no* instruction on informed consent should have

---

[15] For example, in its opening brief, OMG points to a colloquy as support for the proposition that it adequately raised to the trial court the contention that it now raises on appeal. However, that colloquy, a portion of which is quoted above at 245 Or App at 534 n 9, related to a provision in a draft—*viz.*, a statement that OMG was required to obtain Bobbi's informed consent to a vaginal delivery—that was ultimately eliminated from the final instruction that was actually given to the jury.

been given because, as a matter of law, informed consent was inapposite—was unpreserved for our review. *See Peitsch v. Keizer*, 219 Or App 114, 116, 180 P3d 1239 (2008) (rejecting as unpreserved a claim of instructional error because "the exception that [the] plaintiffs' counsel did raise at that time did not cogently present for the trial court's consideration the alleged deficiencies in that instruction that [the] plaintiffs urge on appeal").

Having rejected OMG's liability-related challenges, we turn to its fifth assignment of error. In that assignment, OMG contends that the trial court erred in denying its motion to reduce plaintiffs' award of noneconomic damages to $500,000 pursuant to ORS 31.710(1), which provides:

> "Except for claims subject to ORS 30.260 to 30.300 and ORS chapter 656, in any civil action seeking damages arising out of bodily injury, including emotional injury or distress, death or property damage of any one person including claims for loss of care, comfort, companionship and society and loss of consortium, the amount awarded for noneconomic damages shall not exceed $500,000."[16]

Specifically, relying on our opinion in *Christiansen v. Providence Health System*, 210 Or App 290, 150 P3d 50 (2006), *aff'd on other grounds*, 344 Or 445, 184 P3d 1121 (2008), OMG contends that

> "ORS 31.710 does not violate the remedy clause of Article I, section 10[,] of the Oregon Constitution when applied to a claim for prenatal injuries. In *Christiansen * * *,* this court applied the remedy clause methodology set forth by the Oregon Supreme Court in *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 23 P3d 333 (2001), and held that the statute of ultimate repose found at ORS 12.110(4) did not violate the remedy clause when applied to a claim for prenatal injuries. This court reasoned that because a claim for prenatal injuries caused by medical negligence was not recognized by the common law of Oregon or any other jurisdiction around the time the Oregon Constitution was adopted,

---

[16] In turn, "noneconomic damages" are defined as "subjective, nonmonetary losses, including but not limited to pain, mental suffering, emotional distress, humiliation, injury to reputation, loss of care, comfort, companionship and society, loss of consortium, inconvenience and interference with normal and usual activities apart from gainful employment." ORS 31.710(2)(b).

the plaintiffs would not have had an absolute common law right to bring such an action at that time."

According to OMG, because plaintiffs sought to recover for Braedon's prenatal injuries, application of ORS 31.710 did not violate the remedy clause.

Relatedly, OMG contends that application of the statutory cap to plaintiffs' claim for prenatal injuries does not violate the jury trial provisions of Article I, section 17, or Article VII (Amended), section 3. That is so because, notwithstanding several appellate decisions that antedated the analytical methodology established in *Smothers*, more recent case law indicates that, in OMG's words, "where there is no protected right to a remedy, there can be no protected right to a jury trial."

Conversely, plaintiffs dispute the predicate of OMG's argument—that is, that plaintiffs' claim is a claim for prenatal injuries. Instead, they contend, plaintiffs' claim is properly, and simply, characterized as a negligence claim— and because a claim for negligence antedated 1857, the application of ORS 31.710 to limit plaintiffs' recovery would violate the remedy clause. Alternatively, they contend that, under the Supreme Court's decision in *Lakin v. Senco Products, Inc.*, 329 Or 62, 987 P2d 463, *on recons*, 329 Or 369, 987 P2d 476 (1999), "even if [plaintiffs' claim] is for prenatal injuries, [it] is, at a minimum, of like nature to a negligence claim that existed in 1857," so that application of the statutory cap violates Article I, section 17. Finally, plaintiffs contend that Article VII (Amended), section 3, "applies to all common law tort claims, regardless of whether they existed in 1857," and, thus, the application of ORS 31.710 to plaintiffs' common-law negligence claim violates that constitutional provision.

For the reasons explained below, we agree with OMG that, under *Christiansen*, a claim for prenatal injuries in the circumstances presented here did not exist in 1857. Further, in light of several cases decided after *Smothers*, we conclude that, because plaintiffs would not have had a cognizable claim for prenatal injuries in 1857, neither the remedy clause of Article I, section 10, nor the jury trial provisions of Article I, section 17, and Article VII (Amended), section 3,

preclude the application of ORS 31.710 in the circumstances of this case.

In *Christiansen*, the plaintiff, who was the mother and conservator of the estate of her minor child, brought an action against a hospital and an obstetrician, alleging that they "failed to recognize signs of fetal distress and maternal infection during [the] plaintiff's labor * * * and, as a result, negligently delayed performing a cesarean section delivery of the child," who suffered injuries. 210 Or App at 292. The issue in *Christiansen* was whether the statute of ultimate repose in ORS 12.110(4) violated the remedy clause of Article I, section 10, which provides, in part, that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Applying the analytic construct established in *Smothers*, we explained that the dispositive issue was whether the plaintiff had alleged an injury to a right that Article I, section 10, protected. In other words, the question became "whether a claim for prenatal injuries caused by medical negligence was recognized by the common law of Oregon, or any other jurisdiction, around the time the Oregon Constitution was adopted." *Christiansen*, 210 Or App at 297. Ultimately, we concluded that, "[i]n the years immediately surrounding the adoption of the Oregon Constitution, no Oregon case addressed whether an infant injured *during birth* could maintain an action for medical negligence against the delivering physician." *Id.* at 297-98 (emphasis added). Accordingly, we held that application of ORS 12.110(4) did not violate the remedy clause.[17]

Consistently with the reasoning expressed in our opinion in *Christiansen*, we conclude that a claim for prenatal injuries—including those that occur during birth—did not exist at the time that the Oregon Constitution was adopted. Accordingly, in the circumstances of this case, the remedy

---

[17] The Supreme Court ultimately affirmed our decision in *Christiansen* on different grounds. *Christiansen v. Providence Health System*, 344 Or 445, 452, 184 P3d 1121 (2008) (holding that, even if a claim for prenatal injuries had been recognized before statehood, Article I, section 10, did not prevent "the legislature from imposing periods of limitation on the claims of minors by altering a prestatehood tolling provision for minors").

clause does not preclude application of the statutory cap on noneconomic damages. Further, as we will explain, our determination in that regard also necessarily forecloses plaintiffs' contention that the jury trial provisions of Article I, section 17, and Article VII (Amended), section 3, preclude the application of ORS 31.710.

We begin with Article I, section 17, which provides that "[i]n all civil cases the right of Trial by Jury shall remain inviolate." That constitutional provision "is not a source of law that creates or retains a substantive claim or a theory of recovery in favor of any party." *Jensen v. Whitlow*, 334 Or 412, 422, 51 P3d 599 (2002). Instead, as the Supreme Court explained in *Lakin*, "Article I, section 17, guarantees a jury trial in civil actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857 and *in cases of like nature*." 329 Or at 82 (emphasis added). A few years later, the Supreme Court decided *Hughes v. PeaceHealth*, 344 Or 142, 154-55, 178 P3d 225 (2008), a case in which the plaintiff contended that "the jury trial right that Article I, section 17, guarantees is not confined to the class of cases in which it was customary in 1857, but also applies to cases of like nature." (Internal quotation marks omitted.) In that case, the plaintiff posited that, in light of the principle that the court had expressed in *Lakin*, as well as other cases, she had a right to a jury determination of damages in her wrongful death claim because it was akin to a personal injury action. The court rejected the plaintiff's "expansive" view of her claim because it clearly conflicted with the principle that Article I, section 17, is not a source of law that creates or retains a substantive claim or theory of recovery. Given *Hughes*, and in light of our holding in *Christiansen*, we necessarily reject plaintiffs' contention that, "even if [plaintiffs' claim] is for prenatal injuries, [it] is, at a minimum, of like nature to a negligence claim that existed in 1857" such that application of the statutory cap violates Article I, section 17.

We turn then to the final constitutional provision invoked in this case—*viz.*, Article VII (Amended), section 3. That provision states, in part, that,

"[i]n actions at law, where the value in controversy shall exceed $750, the right of trial by jury shall be preserved,

and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

In *Voth v. State of Oregon*, 190 Or App 154, 161, 78 P3d 565 (2003), *rev den*, 336 Or 377 (2004), the plaintiff contended that Article I, section 17, and Article VII (Amended), section 3, "guarantee[d] him the right to a trial by jury on his claims for noneconomic damages." Noting that Article I, section 17, was not a "source of law that creates or retains a substantive claim or a theory of recovery in favor of any party," *Jensen*, 334 Or at 422, we held that Article I, section 17, "d[id] not assist [the] plaintiff" because "the common law did not provide a jury trial for negligence and intentional infliction of emotional distress actions against the state in 1857[,]" *Voth*, 190 Or App at 161. Similarly, we held that the plaintiff's contention concerning Article VII (Amended), section 3, failed for the same reason. *Id.* at 161-62. Specifically we explained:

"In *Greist v. Phillips*, 322 Or 281, 293, 906 P2d 789 (1995), the court characterized section 3 as 'guarant[eeing] that, after a jury trial, "no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict.'" As the court explained in *Greist*, Article VII (Amended), section 3, addresses the power of courts to reexamine issues decided by a jury. 322 Or at 296. While Article VII (Amended), section 3, reaffirms the right of trial by jury, *it is not a source of law that creates or retains a substantive claim or theory of recovery and is like Article I, section 17, in that regard.*"

*Voth*, 190 Or App at 162 (brackets in *Voth*; emphasis added).

Here, as we have previously explained, plaintiffs had no protected right to a remedy because, consistently with our opinion in *Christiansen*, a claim for prenatal injuries did not exist at the time that the Oregon Constitution was adopted. Accordingly, consistently with the principles expressed in *Voth*, Article VII (Amended), section 3, does not assist plaintiffs.

In sum, neither the remedy clause of Article I, section 10, nor the jury trial provisions of Article I, section 17, and Article VII (Amended), section 3, preclude application of

ORS 31.710 under the circumstances of this case. For that reason, the trial court erred in denying OMG's motion to reduce plaintiffs' award of noneconomic damages to $500,000 pursuant to ORS 31.710(1).

Finally, we address OMG's sixth assignment of error. In that assignment, OMG contends that the trial court erred in awarding plaintiffs, as the prevailing party, the costs of preparing daily transcripts during trial because, OMG asserts, those costs are not recoverable under ORS 21.470(5). The parties essentially renew their arguments to the trial court concerning the proper construction of that statute.

In resolving that issue, we are guided by the principles of interpretation described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), as amplified in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). In general terms, "we attempt to determine the meaning of the statute most likely intended by the legislature, examining the text in context along with any legislative history offered by the parties and, if necessary, relevant canons of construction." *Friends of Yamhill County v. Yamhill County*, 229 Or App 188, 192, 211 P3d 297 (2009). Changes in the text of a statute over time are context for interpreting the version at issue in a given case. *See Krieger v. Just*, 319 Or 328, 336, 876 P2d 754 (1994) ("In a serially amended statute * * *, the wording changes adopted from session to session are a part of [the] context of the present version of the statute being construed.").

ORCP 68 A governs the allowance of costs and disbursements in the trial court. Although ORCP 68 A(2) does not include the costs of daily trial transcripts in its nonexclusive list of recoverable "costs and disbursements," the rule's definition of "costs and disbursements" encompasses "any other expense specifically allowed by agreement, by these rules, or by other rule or *statute*." (Emphasis added.) As support for the award in this case, as being "allowed by * * * statute," plaintiffs rely on a single sentence from ORS 21.470(5), which provides, in part:

> "Except as otherwise provided by law, the fees for preparing a transcript requested by a party shall be paid forthwith by the party, and when paid shall be taxable as disbursements in the case."

In isolation that sentence would appear to confirm plaintiffs' contention that they are entitled to daily transcript fees. However, when the sentence is viewed in the context of ORS 21.470 as a whole, plaintiffs' position is unavailing. That statute provides:

"(1)   A reporter appointed under ORS 8.340(2) may not charge more than $2.50 per page for the original transcript, or more than 25 cents per page for each additional copy, for preparing transcripts *on appeal* as provided in ORS 8.350.

"(2)   Except as provided in subsection (3) of this section, a reporter employed by one of the parties may charge fees as agreed to between the reporter and all of the parties to the proceeding for preparing transcripts *on appeal* as provided in ORS 8.350. The reporter and the parties shall agree to the fees to be charged prior to the commencement of the proceeding to be recorded. Any fees agreed upon shall be charged to parties joining the proceeding after the commencement of the proceeding for preparing transcripts *on appeal* as provided in ORS 8.350.

"(3)   A reporter employed by one of the parties may not charge a public body, as defined by ORS 174.109, fees for preparing transcripts *on appeal* as provided in ORS 8.350 that exceed the fees established by subsection (1) of this section.

"(4)   Each page of the original transcript *on appeal* prepared by a reporter under this section must be prepared as specified by rules for transcripts on appeal adopted by the Supreme Court.

"(5)   Except as otherwise provided by law, the fees for preparing a transcript requested by a party shall be paid forthwith by the party, and when paid shall be taxable as disbursements in the case. The fees for preparing a transcript requested by the court, and not by a party, shall be paid by the state from funds available for the purpose.

"(6)   When the court provides personnel to prepare transcripts from audio records of court proceedings, the transcript fees provided in subsection (1) of this section to be paid by a party shall be paid to the clerk of the court."

(Emphasis added.)

Viewed in context, it appears that subsection (5), like every other subsection in this statute, concerns transcripts on appeal. Alternatively, to the extent that each of the subsections other than subsection (5) either specifies transcripts "on appeal" or cross-references another subsection that does so, it might be argued that subsection (5), because it fails to specify "on appeal," applies to any transcript. The latter view, however, is foreclosed by the evolution of the statute over the last 30 years. In 1981, the legislature amended the then-extant version of ORS 21.470—which pertained exclusively to appellate transcripts—by adding the sentence on which plaintiffs rely here. Or Laws 1981, ch 3, § 86 (Special Session). A "before-and-after" comparison of the text of ORS 21.470 shows that nothing in the amendment altered the statute's exclusively appellate application.[18]

Thereafter, the statute was amended to its current form in 2005. Or Laws 2005, ch 164, § 1.[19] The 2005 amendments added three new subsections—*viz.*, subsections (2)

---

[18] The 1981 amended version of ORS 21.470, with deleted text in brackets and italics and new text in boldface, read as follows:

"(1) The fees of the official reporter of the circuit court for preparing transcripts on appeal as provided in ORS 8.350 shall be not more than $2 per page for the original copy, such page to consist of 25 lines with margins of one and one-half inches on the left-hand side and one-half inch on the right-hand side, not more than 25 cents per page for one copy of the original, and not more than 25 cents per page for each additional copy.[, *and shall be paid forthwith by the parties or party for whose benefit ordered, and when paid shall be taxed as other costs in the case; provided, that when the defendant in any criminal cause who has perfected an appeal from judgment against him presents to the judge satisfactory proof, by affidavit or otherwise, that he is unable to pay for such transcript, the judge, if in his opinion justice will be thereby promoted, may order the transcript to be made; and in all cases where transcript shall be ordered by the court, where not asked by the parties, the same shall be paid for out of the county treasury in the same manner as provided in ORS 8.390 for the payment of per diem compensation.*] **Except as otherwise provided by law, the fees for preparing a transcript requested by a party shall be paid forthwith by the party, and when paid shall be taxable as disbursements in the case. The fees for preparing a transcript requested by the court, and not by a party, shall be paid by the state from funds available for the purpose.**

"(2) Where the court provides personnel to prepare transcripts from audio [*recordings*] **records** of court proceedings, the transcript fees provided in subsection (1) of this section **to be paid by a party** shall be paid to the clerk of the court."

[19] By that time, the statute had also been amended to increase the cost that a reporter could charge for preparing each page of the transcript. Or Laws 1987, ch 796, § 1.

through (4)—each of which concerns the preparation of the transcript on appeal. Further, the sentence on which plaintiffs rely was moved from subsection (1) to its own subsection—that is, subsection (5). Despite that change in structure, however, the statute as a whole continued to reflect the legislature's intent that the recovery of "[t]he fees for preparing a transcript" as contemplated in subsection (5) referred to the transcript "on appeal" referred to in the four preceding subsections. ORS 21.470.[20]

Thus, the trial court erred in awarding plaintiffs the cost of preparing daily trial transcripts. Accordingly, we reverse the award of those costs in the supplemental judgment.

General judgment reversed and remanded with instructions to enter judgment reducing plaintiffs' award of noneconomic damages to $500,000; otherwise affirmed. Supplemental judgment reversed and remanded.

---

[20] We further note that construing the sentence from ORS 21.470(5) as plaintiffs urge would subvert the prohibition on the recovery of transcript costs in ORS 21.270(5), which provides that "[t]he [trial] fees provided for in this section include any reporting of the trial proceedings, but not the preparation of transcripts of a report." Plaintiffs' construction of ORS 21.470(5) would permit what ORS 21.270(5) precludes.