150 September 26, 2013 No. 41

IN THE SUPREME COURT OF THE
STATE OF OREGON

Bobbi KLUTSCHKOWSKI
and Kevin Klutschkowski,
personally and as guardians ad litem for
Braedon Klutschkowski,
a minor child,
*Petitioners on Review*,
*Cross-Respondents on Review*,

*v.*

PEACEHEALTH;
Amy McCarthy;
Center for Women's Health, P.C.;
Zena I. Monji;
and Zena I. Monji, M.D., P.C.,
*Defendants*,

*and*

OREGON MEDICAL GROUP, P.C.,
*Respondent on Review*,
*Cross-Petitioner on Review.*

(CC 160615518; CA A138722; SC S059869)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 17, 2012; resubmitted January 7, 2013.

Kathryn H. Clarke, Portland, argued the cause and filed the brief for petitioners on review/cross-respondents on review. With her on the brief were Richard M. Rogers and Patrick L. Block, Portland.

Matthew J. Kalmanson and Janet M. Schroer, Hart Wagner LLP, Portland, argued the cause and filed the briefs for respondent on review/cross-petitioner on review. With them on the briefs was Marjorie A. Speirs.

_____

* Appeal from Lane County Circuit Court, Karsten H. Rasmussen, Judge. 245 Or App 524, 263 P3d 1130 (2011).

W. Eugene Hallman, Pendleton, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

KISTLER, J.

The decision of the Court of Appeals is reversed in part and affirmed in part. The judgment of the circuit court is affirmed.

Landau, J., concurred and filed an opinion.

**KISTLER, J.**

Plaintiffs brought this medical malpractice action to recover for injuries that their son sustained during delivery. On review, the issues are whether ORCP 59 H limits an appellate court's ability to review objections to a trial court's instructional rulings and whether a statutory cap on noneconomic damages constitutionally can be applied to actions brought by children injured during birth. The Court of Appeals held that, because defendant had not excepted to the trial court's rulings as ORCP 59 H requires, it could not seek appellate review of those rulings. *Klutschkowski v. PeaceHealth*, 245 Or App 524, 543-44, 263 P3d 1130 (2011). The Court of Appeals also explained that, because the common law did not recognize a cause of action in 1857 for injuries a child sustained during birth, Article I, sections 10 and 17, of the Oregon Constitution do not limit the legislature's authority to cap the damages resulting from those injuries; the Court of Appeals accordingly held that the trial court should have applied a statutory cap to the jury's award of noneconomic damages. *Id.* at 548-49. We allowed the parties' cross-petitions for review and now reverse the Court of Appeals decision to the extent that it reduced the jury's award of noneconomic damages.

I

We set out the facts consistently with the jury's verdict. *See Mead v. Legacy Health System*, 352 Or 267, 269 n 2, 283 P3d 904 (2012); *Delaney v. Taco Time Int'l*, 297 Or 10, 12, 681 P2d 114 (1984). Mother and father have four children. When mother gave birth to her fourth child Braedon, he sustained an injury to the nerves that control the use of his arm. That injury is more likely to occur when a condition known as a shoulder dystocia has occurred during a previous delivery and when the child's fetal size exceeds a certain weight.

A shoulder dystocia occurs when an infant's shoulder becomes stuck behind the mother's pubic bone as the infant travels down the birth canal. When a shoulder dystocia occurs, the delivering physician customarily uses one of two maneuvers (the McRoberts maneuver or the Woods corkscrew

maneuver) to free the infant's shoulder and complete the delivery.[1] Those maneuvers and the traction resulting from the shoulder dystocia can stretch and sometimes injure the infant's brachial plexus, a network of nerves that run from the area of the spine around the infant's neck and control the movement of the infant's arm. Once a shoulder dystocia has occurred during a delivery, the risk of a brachial plexus injury in a subsequent delivery increases; it is 10 times more likely that another shoulder dystocia will occur during a subsequent delivery.

The second factor that increases the risk of a brachial plexus injury is the infant's fetal size. An infant whose fetal size exceeds 3500 to 4000 grams is more likely to sustain a brachial plexus injury during birth because of the increased traction that a relatively large infant experiences as he or she travels through the birth canal. The expert medical testimony in this case permitted the jury to find that, when those two risk factors are present, the standard of care requires an obstetrician to inform an expectant mother of the risk of a brachial plexus injury if she delivers the child vaginally and to discuss the option of proceeding with a caesarian delivery, commonly known as a C-section.

In 1999, mother gave birth to her third child Anna. When Anna was born, she weighed 4135 grams, and her delivery was complicated by a shoulder dystocia. Dr. Powell, the obstetrician who delivered Anna, worked for defendant Oregon Medical Group (defendant or the Medical Group). Powell diagnosed the shoulder dystocia but did not mention it to mother. In the hospital chart, he documented that "[t]here was a shoulder dystocia [which he] managed by shoulder rotation maneuver with the patient's hips in a flexed position."[2] Anna did not suffer any injuries as a result of the shoulder dystocia.

---

[1] The McRoberts maneuver is performed by flexing the mother's legs to facilitate release of the infant's shoulder. The Woods corkscrew maneuver requires the doctor to rotate the infant 180 degrees while the infant is within the birth canal.

[2] There was a dispute at trial whether a shoulder dystocia had, in fact, occurred during Anna's delivery or whether the chart notation was an instance in which Dr. Powell had "overcalled" the condition and used the shoulder rotation and flexed hip maneuvers only as prophylactic measures. On review, we assume that the jury resolved that factual dispute consistently with its finding of negligence.

Five years later, in 2004, mother became pregnant with her fourth child Braedon. By that time, Powell no longer worked for the Medical Group, and mother began seeing a new obstetrician employed by the group, Dr. McCarthy. When McCarthy began providing prenatal care to mother, McCarthy reviewed the hospital file from Anna's delivery in 1999. That file contained Powell's notation that a shoulder dystocia had occurred, a notation that McCarthy transferred to Braedon's prenatal records. McCarthy, however, did not tell mother of the increased risk of another shoulder dystocia and a brachial plexus injury, nor did she discuss with mother that, because of that risk, she may want to consider a C-section.

During the third trimester of mother's pregnancy with Braedon, McCarthy observed that Braedon was "large for [his] gestational age." To determine Braedon's actual size, McCarthy ordered an ultrasound, which revealed that Braedon weighed 3964 grams. Because mother was concerned about the size that Braedon would reach by the time she went into labor, she asked, and McCarthy agreed, to induce labor early. However, after receiving the results of the ultrasound, McCarthy did not tell mother that the baby's fetal size increased the risk of a shoulder dystocia and a brachial plexus injury, even though that risk factor and the earlier shoulder dystocia were both present. By that time, McCarthy had forgotten that a shoulder dystocia had occurred during Anna's delivery.

Mother went into labor before it was scheduled to be induced. When she arrived at the hospital, McCarthy was unavailable; so, Dr. Monji, the on-call obstetrician, assumed responsibility for delivering Braedon. (Monji was also an employee of the Medical Group.) When Monji spoke with mother before the birth, she asked mother whether there had been any complications in her previous deliveries. Mother replied that there had not been. Additionally, the prenatal record that the Medical Group sent to the hospital did not contain the notation of the earlier shoulder dystocia or the results of the ultrasound and fetal size determination. Monji accordingly did not discuss with mother the risks of proceeding with a vaginal delivery rather than a C-section.

During Braedon's delivery, a shoulder dystocia occurred. According to Monji's delivery notes, Braedon was delivered "with a modified McRoberts maneuver." At one point during Braedon's delivery, Monji asked father, who was in the delivery room, to help "get [mother's] legs way back," "up close to her chest," a request that was consistent with using a McRoberts maneuver to deliver Braedon. Father testified at trial that, at a later point during the delivery, he saw Monji "plac[e] her hands around Braedon's [head]—underneath Braedon's jaw around his neck, and [she] was pulling." At that point, father "thought that maybe something was wrong."

Braedon was born with bruises on his right arm, shoulder, and areas of his chest. After the delivery, the range of motion in his right arm was limited, and he was transferred to the neonatal intensive care unit for observation. When he was released from the neonatal unit the next day, Braedon's color had substantially returned to normal, but the range of motion in his right arm remained limited. Braedon was eventually diagnosed with a brachial plexus injury, an injury that has substantially impaired Braedon's use of his right arm.

Mother and father (plaintiffs) filed this action for medical malpractice against the Medical Group and various other defendants.[3] Before trial, they amended the complaint to allege claims against only the Medical Group, Dr. Monji, and Dr. McCarthy. The day before trial, they dismissed their claims against Monji and McCarthy, leaving the Medical Group as the only defendant. Plaintiffs alleged that the Medical Group was negligent:

> "[(1)]   In failing to inform [mother] that the occurrence of shoulder dystocia in the March 3, 1999, delivery and the fetal size determination by Dr. McCarthy and by the April 23, 2004, ultrasound increased the risk of shoulder dystocia occurring in a vaginal delivery of Braedon Klutschkowski;

---

[3] The third amended complaint named father and mother as plaintiffs, proceeding personally and as guardians *ad litem* on behalf of Braedon. That complaint sought both economic and noneconomic damages to compensate for Braedon's injuries, as well as noneconomic damages to compensate for mother's injuries, which included emotional distress. Only the claim for Braedon's economic and noneconomic damages was submitted to the jury.

"[(2)]   In failing to inform [mother] that there was increased risk of Braedon Klutschkowski suffering a brachial plexus injury if shoulder dystocia occurred during his delivery;

"[(3)]   In failing to offer [mother] the option of a C-section as an alternative to a vaginal delivery of Braedon Klutschkowski;

"[(4)]   In failing to document in [mother's] pregnancy record for her pregnancy with Braedon Klutschkowski the occurrence of shoulder dystocia during the March 3, 1999, delivery; [and]

"[(5)]   In failing to inform Dr. Monji of the occurrence of the shoulder dystocia in [mother's] March 3, 1999, delivery, of Dr. McCarthy's assessment of Braedon's fetal size as large for gestational age and of the April 23, 2004, ultrasound documentation of an estimated fetal weight of 3964 g. and greater than the 97th percentile[.]"

In a separate paragraph of the complaint, plaintiffs alleged that the Medical Group "did not obtain [mother's] informed consent to delay Braedon Klutschkowski's delivery past [the date of the ultrasound], and to deliver Braedon Klutschkowski vaginally rather than by cesarean section." Finally, plaintiffs alleged that, as a result of the Medical Group's negligence and failure to obtain mother's informed consent, "Braedon Klutschkowski suffered permanent and severe birth injuries when he was born on or about May 2, 2004."

We discuss below the specific objections and rulings that have given rise to the petition and cross-petition for review in this case. At this point, it is sufficient to note that the jury returned a general verdict, finding that the Medical Group had been negligent. It awarded plaintiffs $557,881.11 in economic damages and $1,375,000 in noneconomic damages. After the jury returned its verdict, defendant moved to impose a $500,000 statutory cap on the jury's award of noneconomic damages. Plaintiffs responded that applying the cap would violate Article I, sections 10 and 17, of the Oregon Constitution. The trial court denied defendant's motion. On appeal, the Court of Appeals reversed the trial court's ruling that capping the jury's award of noneconomic damages would violate the Oregon Constitution but otherwise affirmed the trial court's judgment.

## II

On appeal and again on review, the parties debate whether the trial court erred in instructing the jury and whether applying a statutory cap to the jury's damages award would violate the Oregon Constitution. We begin with defendant's challenges to giving plaintiffs' requested instruction on informed consent and to declining to give defendant's requested instruction regarding its responsibility for its employees.

### A

Defendant argues initially that the trial court erred in giving plaintiffs' requested instruction on informed consent. Because the Court of Appeals ruled that defendant did not preserve its objection to that instruction or properly except to it, we set out defendant's objections and exception to the instruction. We then consider whether defendant's objections and exception were sufficient to preserve the issue it sought to raise on appeal. Because we conclude that they were, we consider finally whether the trial court committed reversible error in instructing the jury on informed consent.

At multiple points during the trial, the parties discussed whether and how ORS 677.097, the informed consent statute, applies to a vaginal delivery. Defendant consistently took the position that a vaginal delivery is not a "procedure or treatment" that requires "informed consent" within the meaning of ORS 677.097.[4] In defendant's view, a vaginal delivery is the natural consequence of a pregnancy and will occur without regard to whether the physician seeks or obtains the mother's consent. As a result, defendant argued, the informed consent statute never applies to a vaginal delivery. Plaintiffs took precisely the opposite position. They argued that, as a matter of law, the statute always applies to vaginal deliveries. The trial court, for its part, consistently expressed its view that whether and how the informed consent statute applies to vaginal deliveries is a question for the jury.

---

[4] ORS 677.097 provides that a physician must describe the "procedure or treatment to be undertaken," alternatives to the procedure or treatment, and the "risks, if any, to the procedure or treatment." Additionally, it specifies what a physician must do if a patient asks for more information about the procedure or treatment.

On Monday morning, two days before the trial court instructed the jury, defendant moved for a directed verdict on plaintiffs' informed consent claim, reiterating its position that the informed consent statute does not apply to vaginal deliveries. The trial court denied that motion. Immediately after ruling on that motion, the trial court invited objections to its proposed instructions. In a colloquy that covers more than 50 pages of the transcript, both sides raised numerous objections to the proposed instructions. When they reached the instruction on informed consent, the court unilaterally noted the parties' competing positions and posed a hypothetical to the parties to begin the discussion:

> "THE COURT:  A woman shows up. She's pregnant. Her first set of options is have the child, not have the child. She decides on having the child. Everyone, I gather from the testimony I'm hearing, decides it will be vaginal. That's the, for lack of a better term, the default position. Your position [defendant] is that informed consent is not required because [a vaginal delivery is] the default position.

> "[DEFENSE COUNSEL]:  Right. Yes. I mean, I don't know how—let's assume there's no—there's no discussion at all, and the vaginal birth just occurs. Can the mother then just sue the doctor because, you know, she—she experiences complications and then says, hey, you didn't tell me a pregnancy was dangerous, you didn't tell me a vaginal delivery could cause me problems[.] I wouldn't have done it otherwise. I just—it doesn't follow. There's—you can't obtain informed consent for a vaginal delivery."

The trial court explained that it had difficulty reconciling defendant's position that informed consent is never required and plaintiffs' position that it is always required. It asked defense counsel:

> "[I]f you take vaginal delivery as a default position, but [if you do] not automatically assume there's no informed consent required [as defendant does], nor automatically assume that it must be required [as plaintiffs do], then is the determination of the duty not the jury's?"

Given that question, defense counsel answered, "It's the jury's. It's the jury's determination." The trial court then asked, "So, if that's correct, then does this [instruction on

informed consent] belong in [the jury instructions] or not? Because that's my position." Defense counsel answered, "No."

After considering the parties' objections, the trial court told the parties that it would take the objections that they had made on the record as exceptions and that they need not renew those exceptions after the court instructed the jury. Specifically, the trial court told the parties:

> "All right. I'm going to ask for exceptions after I instruct, and if you want to just be extra careful with your record, you can do that, but I'm going to just—I'm going to tell you now that any disagreement you have on the record or any disagreement you have by virtue of an instruction you offered the court that I haven't given, I will take that right now as an exception, and I don't feel the need to add to that.

> "The purpose of the change in [ORCP 59] is to articulate [a] reason that might change my mind. And I spent a couple weeks thinking about these things, and I know that the three of you have spent far more than a couple weeks thinking about these. So I think we've had a pretty full discussion, and I'm comfortable with your record."

The trial ended two days later on Wednesday. That morning, the trial court shared a "new version" of the instructions with the parties. Plaintiffs objected to the new version of the informed consent instruction because the court "ha[d] taken out the direct instruction that Oregon Medical Group had the obligation to obtain her informed consent." The court acknowledged that it had taken out "the first paragraph [of the instruction on informed consent] that I had had before" and noted plaintiffs' objection.

Later that day, the court instructed the jury. In its instructions, the court told the jury that plaintiffs had made five specific allegations of negligence and then repeated to the jury, essentially verbatim, the five specifications of negligence quoted above. The court described what plaintiffs had to prove to recover on their negligence claim, instructed the jury on foreseeability, and also instructed on the standard of care. It then turned to informed consent. The instruction on informed consent divides into two parts. The first part, which we do not quote in full, told the jury what

"a physician must explain" "[t]o obtain the informed consent of a patient." The second part of the instruction told the jury:

> "A failure to obtain Mrs. Klutschkowski's informed consent may be considered by you in determining whether or not defendant was negligent.
>
> "In order to find defendant negligent in failing to provide informed consent, you must determine that Mrs. Klutschkowski would not have consented to a vaginal delivery had all the risks and alternatives you find to be material been disclosed to her."

After instructing the jury, the trial court told counsel for both parties that it was "tak[ing] as given all the exceptions that you *** have already made" and asked whether counsel "wish[ed] to make any other exceptions?" In response to that question, defense counsel identified one other exception that he did not think he previously had mentioned. The court noted the exception, and the parties gave their closing arguments to the jury.

The jury returned a general verdict finding that defendant was "negligent in one or more ways alleged by plaintiffs" and, as noted, awarded plaintiffs $557,881.11 in economic damages and $1,375,000 in noneconomic damages. Defendant appealed, assigning error to the trial court's rulings denying its motion for a directed verdict on plaintiffs' informed consent claim and overruling its objection to instructing the jury on informed consent. On appeal, defendant argued that both rulings were incorrect for the same reason—the informed consent statute has no application to a vaginal delivery.

Relying on *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 173-74, 61 P3d 928 (2003), the Court of Appeals held that defendant had not shown prejudice from any error in denying its directed verdict motion. *Klutschkowski*, 245 Or App at 538-39. The Court of Appeals started from the proposition that plaintiffs' informed consent claim was effectively a sixth specification of negligence. *Id.* Given the jury's general verdict, the court reasoned that the jury could have found defendant negligent based on one or more of the first five specifications of negligence, which defendant had not challenged, rather than on the informed consent claim.

*Id.* It followed that defendant could not show that any error in submitting plaintiffs' informed consent claim to the jury had prejudiced it. *Id.* at 539 (citing *Shoup*, 335 Or at 176).

The Court of Appeals then turned to defendant's objection to the instruction on informed consent. It observed that ORCP 59 H(1) provides that "[a] party may not obtain review on appeal of an asserted error by a trial court * * * in giving or refusing to give an instruction to the jury" unless the party challenging the trial court's instructional ruling has "identified the asserted error to the trial court and made a notation of exception immediately after the court instructed the jury." The court also observed that ORCP 59 H(2) requires that the exception be "state[d] with particularity."

The court reasoned that ORCP 59 H barred defendant's challenge to the instruction on informed consent because defendant had not excepted with particularity to that instruction. 245 Or App at 543-44. The court recognized that a party could comply with ORCP 59 H by incorporating an earlier objection by reference. *Id.* at 540-41. However, the Court of Appeals explained that, in this case, it could not tell whether the terms of the trial court's proposed instructions had changed between Monday (the day that defendant had objected to the instruction on informed consent) and Wednesday (the day that the trial court had instructed the jury) in such a way that defendant's earlier objection no longer applied. *Id.* at 543.

The Court of Appeals identified an additional reason for not reaching the merits of defendant's objection. It explained that, in the trial court, defendant's objection to instructing the jury on informed consent had turned on whether "*the particular facts of this case* required [defendant] to inform [mother] about [the] risks of and alternatives to delivering Braedon vaginally." *Id.* (emphasis in original). Given that view of defendant's trial position, the Court of Appeals concluded that defendant's argument on appeal— "that *no* instruction on informed consent should have been given because, as a matter of law, informed consent was inapposite—was unpreserved for appellate review." *Id.* at 543-44 (emphasis in original).

On review, defendant argues that, in promulgating ORCP 59 H, the Council on Court Procedures had neither the authority nor the intent to limit the appellate courts' ability to review a trial court's rulings on instructions. We need not resolve that issue; even if ORCP 59 H prescribes what a party must do to perfect an objection to an instructional ruling, defendant complied with that rule. Before explaining why we reach that conclusion, it is perhaps helpful to start with the Court of Appeals' alternative holding that defendant did not preserve the issue it sought to raise on appeal—that informed consent never applies to a vaginal delivery.

The Court of Appeals stated that, in light of the trial court's colloquy with defense counsel, "the [trial] court understood that whether informed consent was required in this case was a jury question—an understanding with which [defendant's] counsel agreed." 245 Or App at 534. The Court of Appeals based its understanding of defendant's trial position on the colloquy quoted above. *See id.* at 534 n 9 (quoting that colloquy as the basis for the court's statement). In that colloquy, the trial court asked defense counsel:

"If you take vaginal delivery as a default position, but [do] not automatically assume that therefore there's no informed consent required, nor automatically assume that [informed consent] must be required, then is the determination of the duty not the jury's?"

Defense counsel replied, "It's the jury's. It's the jury's determination."

The trial court's question asked defense counsel to "not automatically assume that *** there's no informed consent required." The question thus assumed away defendant's position that informed consent is never required for vaginal deliveries. Defense counsel's answer was responsive to the question the trial court put to him, but it did not signal that defense counsel was somehow abandoning the position that defendant consistently had taken throughout the trial. Were there any doubt about the matter, immediately after defense counsel stated, "It's the jury's determination," the trial court asked, "So, if that's correct, then does this [instruction on informed consent] belong in [the jury instructions] or not? Because that's my position [that

it does].” Defense counsel responded, “No.” Defendant preserved the issue that it sought to raise on appeal—that informed consent never applies to vaginal deliveries.

Having concluded that defendant preserved its objection, we turn to the question whether defendant’s exception after the trial court gave its instructions complied with ORCP 59 H. As noted, the trial court told the parties that it understood their positions on informed consent and that it would take the objections that they had raised to its proposed instructions as exceptions. Later, after instructing the jury, the court told the parties that it was “tak[ing] as given all the exceptions that you \*\*\* have already made” and asked whether the parties had “any other” exceptions. The effect of the trial court’s statement was to incorporate by reference defendant’s earlier objections as exceptions to the instructions the trial court just gave.

This court has explained that the purpose of ORCP 59 H is to “inform the trial court that the instruction may be erroneous and to give the court an opportunity to make corrections.” *Delaney*, 297 Or at 18; *see also* *Jett v. Ford Motor Co.*, 335 Or 493, 502-03, 72 P3d 71 (2003). Exceptions must be stated with enough particularity “to apprise the trial court that it was erroneously explaining [the law] to the jury.” *State v. Crosby*, 342 Or 419, 427, 154 P3d 97 (2007). The exception in this case satisfied that standard.

Defendant consistently and repeatedly took the position that, as a matter of law, a vaginal delivery is not a “procedure or treatment” that requires consent within the meaning of the informed consent statute. When the trial court stated that it was “tak[ing] as given all the exceptions that you \*\*\* have already made,” that statement was sufficient to incorporate by reference defendant’s objection to instructing the jury on informed consent. In light of the trial court’s earlier statement that it would take the parties’ objections as exceptions, defendant did not need to do anything more to put the court on notice of its continued position that any instruction on informed consent was error. *See Delaney*, 297 Or at 18 (stating the purpose for taking exceptions).

We appreciate the Court of Appeals' concern that, when a trial court has repeatedly modified its instructions in response to a party's shifting objections, an exception "for the reasons previously stated" may not put a trial court on notice of which objection or objections the party still believes are germane. In this case, however, defendant's position—that informed consent never applies to vaginal deliveries—was consistent throughout the trial. Not only was the trial court well aware of the basis for defendant's objection to its informed consent instruction, but it also was well aware that the only modification that would have satisfied defendant's objection would have been to omit any reference to informed consent altogether, which it did not do. In those circumstances, defendant's exception complied with ORCP 59 H.

Turning to the merits of defendant's objection, we note that defendant did not object at trial to the informed consent instruction on the ground that it inaccurately stated the law. Rather, defendant objected to the instruction for the same reason that it had moved for a directed verdict. In defendant's view, informed consent has no application to a vaginal delivery, and any claim based on informed consent should not be submitted to the jury. Similarly, in its brief in the Court of Appeals, defendant equated its motion for a directed verdict and its objection to the instruction on informed consent. In defendant's view, the trial court's rulings on its directed verdict motion and its objection suffered from the same infirmity: both put before the jury a theory of liability that should never have been submitted to it.

In this posture, we think that the same answer applies to both rulings. Under *Shoup*, even if the trial court erred in submitting that theory of liability to the jury, defendant failed to show that doing so prejudiced it. As the Court of Appeals reasoned, the trial court instructed the jury on five specifications of negligence to which defendant raised no objection. It also instructed the jury on what the Court of Appeals characterized as a sixth specification of negligence. Without a special verdict identifying which specification or specifications gave rise to the jury's finding of

negligence, we cannot say that any error in submitting the informed consent specification prejudiced defendant.

Our decision in *Wallach v. Allstate Ins. Co.*, 344 Or 314, 180 P3d 19 (2008), is not to the contrary. In that case, the trial court incorrectly instructed the jury on how to allocate damages among successive tortfeasors; that is, the instruction gave the jury the wrong legal rule to decide an issue that everyone agreed was properly before the jury. *See id.* at 320-21. As noted, defendant has not argued that the instruction on informed consent incorrectly stated the law. Rather, defendant's objection to instructing the jury on informed consent was the functional equivalent of its motion for a directed verdict on that claim. Both sought to take the issue away from the jury. On review, defendant does not dispute that the Court of Appeals correctly held that, under *Shoup*, it failed to prove that any error in denying its directed verdict motion prejudiced it. The same conclusion applies equally to its objection to instructing the jury on informed consent.

B

We turn to defendant's remaining claim of instructional error. Before trial, plaintiffs dismissed their claims against all defendants except the Medical Group. In explaining the acts for which the Medical Group could be held liable, the trial court instructed the jury:

> "In this case, Oregon Medical Group is the defendant. A corporation can act only through its agents or employees. Any action by the agent or employee of the corporation is the act of that corporation. I instruct you that Dr. McCarthy and Dr. Monji were the agents and employees of Oregon Medical Group."

Before the trial court, defendant argued that the court's proposed instruction was accurate but incomplete. Defendant observed that there was evidence that Dr. Powell was also an employee of the Medical Group, and it reasoned that the trial court's instructions permitted the jury to find the Medical Group liable for any negligence on Powell's part, even though the statute of ultimate repose barred any claim

against defendant based on Powell's actions.[5] To prevent the jury from holding it liable for any negligence on Powell's part, defendant requested the following instruction:

> "There are no allegations of negligence against either Dr. Powell or Sacred Heart Hospital, and plaintiffs are not claiming either Dr. Powell or Sacred Heart Hospital violated the applicable standard of care in any way."[6]

After an extensive colloquy on Wednesday morning in which defendant repeatedly stated its position that the trial court's proposed instruction was incomplete, the trial court declined to supplement its instruction with defendant's requested instruction.

On appeal, defendant assigned error to the trial court's ruling declining to give its requested instruction; defendant argued that the ruling constituted reversible error because it "created an erroneous impression of the law in the minds of the members of the jury[.]" *See Hernandez v. Barbo Machinery Co.*, 327 Or 99, 106, 957 P2d 147 (1998). Plaintiffs responded that defendant's requested instruction was not necessary to explain a material issue and that the instructions the trial court gave explained fully the specific allegations of negligence that plaintiffs were required to prove. The Court of Appeals affirmed the trial court's ruling without discussion. *Klutschkowski*, 245 Or App at 537.

On review, defendant renews its argument that the trial court erred in failing to give its requested instruction. To the extent that the Court of Appeals declined to review defendant's assignment of error because defendant had not properly excepted to the trial court's failure to give its requested instruction, the Court of Appeals erred for the reasons stated above. The colloquy between the trial court and defense counsel after the trial court instructed the jury was sufficient to incorporate by reference defendant's earlier objection. We accordingly turn to the merits of defendant's objection.

---

[5] Powell had been an employee of the Medical Group when he delivered Anna in 1999; plaintiffs have not disputed that ORS 12.110(4) barred a negligence claim against defendant because of any actions or omissions on Powell's part.

[6] The Medical Group did not explain why its requested instruction included the actions of Sacred Heart Hospital, which was dismissed as a defendant.

Read in isolation, the trial court's instruction that a corporation is liable for the negligence of its employees posed a risk that the jury could find defendant liable for Powell's negligent acts or omissions. Powell had been an employee of the Medical Group when he delivered Anna in 1999, and nothing in the instructions stating that the Medical Group was liable for its employees' actions precluded the jury from looking to Powell's actions in 1999 as a source of defendant's liability. Affirmatively instructing the jury that Drs. McCarthy and Monji were defendant's employees did not preclude the jury from finding that Powell was also defendant's employee.

Plaintiffs argue, however, that the specifications of negligence that the trial court read to the jury as part of its instructions effectively limited the jury to finding defendant negligent based on the actions of McCarthy and Monji. We agree. Those specifications alleged that defendant was negligent in its conduct during mother's pregnancy with Braedon, not in its conduct during her earlier pregnancies.[7] In *Hernandez*, we explained that a trial court's refusal to give a party's requested instruction is not reversible error "if the substance of the requested instruction, even if correct, was covered fully by other jury instructions given by the trial court." 327 Or at 106. Read as a whole, the instructions that the trial court gave fully conveyed the substance of the requested instruction; put differently, we cannot say that the trial court's instructions, read as a whole, "created an erroneous impression of law in the minds of the members of the jury[.]" *See id.*

### III

Having addressed the instructional issues raised in defendant's cross-petition for review, we turn to the constitutional issue raised in plaintiffs' petition for review. After the jury returned its verdict, defendant moved to cap the

---

[7] The first, second, third, and fourth specifications of negligence, which the trial court read to the jury, refer to specific actions or omissions regarding either Braedon's delivery or the failure to inform mother of risk factors regarding Braedon's delivery. The fifth specification refers to the failure to inform Dr. Monji of certain information. Finally, the informed consent instruction, read in context, refers to the failure to inform mother of the risks of and alternatives to delivering Braedon vaginally.

noneconomic damages that the jury had awarded. *See* ORS 31.710(1) (imposing a $500,000 cap on noneconomic damages). Plaintiffs responded that applying the cap would violate their right to a remedy under Article I, section 10, of the Oregon Constitution[8] and their right to a jury trial under Article I, section 17, and Article VII (Amended), section 3.[9] Under our decisions, the initial question that plaintiffs' constitutional claims raise is whether the common law recognized a right to recover for prenatal injuries when Oregon adopted its constitution in 1857. *See Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 124, 23 P3d 333 (2001) (Article I, section 10); *Hughes v. PeaceHealth*, 344 Or 142, 156, 178 P3d 225 (2008) (Article I, section 17). If it did, then Article I, sections 10 and 17, limit the legislature's authority to modify plaintiffs' cause of action for medical malpractice and to reduce the jury's damages award. *See Smothers*, 332 Or at 124 (so holding); *Hughes*, 344 Or at 156 (same).

Before the trial court, the parties focused on a Court of Appeals decision, *Christiansen v. Providence Health System*, 210 Or App 290, 202, 150 P3d 50 (2006), *aff'd on other grounds*, 344 Or 445, 184 P3d 1121 (2008), which had held that, when Oregon adopted its constitution in 1857, the common law did not recognize an infant's right to recover for prenatal injuries. Defendant took the position that, under *Christiansen*, all injuries that occur before an infant emerges completely from his or her mother's body are prenatal. Plaintiffs took the position that the phrase "prenatal injuries" means injuries that occur while the child is in the mother's womb but does not include injuries that occur while the child is in the birth canal. After considering the parties' arguments and the evidence presented at trial, the trial

---

[8] Article I, section 10, provides:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

[9] Article I, section 17, provides: "In all civil cases the right of Trial by Jury shall remain inviolate." Article VII (Amended), section 3, provides, in part:

"In actions at law, where the value in controversy shall exceed $750, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

court denied defendant's motion and entered judgment for the full amount of the damages that the jury had awarded.

On appeal, the Court of Appeals interpreted its decision in *Christiansen* as holding that "a claim for prenatal injuries—including those that occur during birth—did not exist at the time that the Oregon Constitution was adopted." *Klutschkowski*, 245 Or App at 546. Because Braedon's injuries had occurred during birth, the Court of Appeals held that, under *Smothers*, *Hughes*, and *Christiansen*, plaintiffs' constitutional challenges to capping the jury's award of noneconomic damages necessarily failed. *Id.* at 546-47.[10] The Court of Appeals accordingly reversed the trial court's judgment to the extent it included all the noneconomic damages the jury had awarded.

In this case, neither party has asked us to reconsider our decisions under Article I, section 10, or Article I, section 17. That is, both parties accept that the common law, as it existed in 1857, is the initial measure of the rights that Article I, sections 10 and 17, grant.[11] The constitutional question raised by plaintiffs' petition for review accordingly reduces to whether, in 1857, the common law recognized a claim for the type of injuries that occurred in this case.

To put that question in context, it is helpful to recount both the nature of plaintiff's claim for negligence and also the facts that bear on when the injury to Braedon occurred. Essentially, plaintiffs' third amended complaint alleged that, at various points during mother's pregnancy, defendant negligently failed to inform her that the baby could experience a shoulder dystocia and a brachial plexus injury during a vaginal delivery and that she could choose a C-section instead. Although the negligent omissions that

---

[10] Oregon has recognized a common-law right to recover for prenatal injuries since 1955. *See Mallison v. Pomeroy*, 205 Or 690, 291 P2d 225 (1955). The state of the common law when Oregon adopted its constitution in 1857 is relevant only because, under *Smothers* and *Hughes*, that issue bears on whether Article I, sections 10 and 17, limit the legislature's authority to alter a cause of action or reduce the amount of a jury award.

[11] Plaintiffs recognize that the common law, as it existed in 1857, is the initial measure of those rights but argue that we should hold that Article I, section 10, protects common-law causes of action not only as they existed in 1857 but also as those causes of action have evolved over time. Given our disposition of plaintiffs' claim, we need not consider plaintiffs' argument and express no opinion on it.

gave rise to plaintiffs' claim occurred at one or more points during mother's pregnancy, the harm that made plaintiffs' claim actionable could and did manifest itself only during delivery and, in this case, resulted in physical injuries only to Braedon. *Cf. Lowe v. Philip Morris USA*, 344 Or 403, 410-11, 183 P3d 181 (2008) (a plaintiff must allege and prove an actual loss or harm to make out a claim for negligence). Put differently, even though the negligent omissions were separated in time from the injuries that Braedon sustained, those injuries were the direct and foreseeable consequence of defendant's earlier failure to warn mother of the risks that, in her case, a vaginal delivery posed to her child.

Moreover, the trial court reasonably could have found that the injury to Braedon occurred, to use Dr. Monji's words, after Braedon's head had been delivered.[12] On that issue, one doctor testified, to a reasonable medical probability, that a shoulder dystocia had occurred when Monji delivered Braedon. Other doctors testified that, when a shoulder dystocia occurs (when the baby's anterior shoulder gets stuck behind the mother's pubic bone), the baby's head typically will have emerged from the mother's body. Father testified that his observations in the delivery room were consistent with Monji's deposition testimony—namely, that she employed a McRoberts maneuver "only after the delivery of Braedon's head." In a related vein, father told mother that, after Braedon's head had emerged, Monji put her hands around Braedon's head and "was pulling very forcibly, and seem[ed] like she was stretching Braedon's neck."[13] Given that evidence, the trial court reasonably could have found that a shoulder dystocia occurred, with a resulting brachial plexus injury, after the delivery of Braedon's head.

_____

[12] In deciding defendant's post-verdict motion to cap the noneconomic damages and plaintiffs' constitutional objection to that motion, the trial court considered the parties' arguments as to when the injury to Braedon occurred. We state the facts consistently with the trial court's post-verdict ruling—namely, in the light most favorable to plaintiffs.

[13] As defendant notes, plaintiffs dismissed their claim that Monji caused the injury to Braedon's arm by negligently pulling on his head. We quote father's statements to mother only as evidence from which the trial court could have found that the risk that defendant negligently failed to warn mother about—a shoulder dystocia and a resulting brachial plexus injury—occurred after Braedon's head had emerged from his mother's body.

With those facts in mind, we turn to the state of the common law when Oregon adopted its constitution in 1857. The common law has recognized a cause of action for negligence since at least the time of the American Revolution. *Smothers*, 332 Or at 129. Similarly, a cause of action for medical malpractice preexisted the adoption of the Oregon Constitution. *See, e.g.*, [*Mead v. Legacy Health System*](), 352 Or 267, 276 n 7, 283 P3d 904 (2012) (discussing the sources of medical malpractice actions); *see also* William Blackstone, 3 *Commentaries on the Laws of England* 122 (1768).[14] Because plaintiffs seek to recover for the negligence and malpractice of defendant's employees, it appears, at first blush, that plaintiffs are entitled to the protections of Article I, sections 10 and 17.

Defendant argues, however, that an exception to those general principles existed in 1857. Defendant relies on two cases, one from Massachusetts in 1884 and another from Illinois in 1900, for the proposition that, in 1857, an infant had no cause of action for prenatal injuries. *See Dietrich v. Northampton*, 138 Mass 14 (1884); *Allaire v. St. Luke's Hosp.*, 184 Ill 359, 56 NE 638 (1900). We turn to those cases to determine the extent to which they carve out an exception from the general principle that negligence and medical malpractice were recognized causes of action in 1857.

In *Dietrich*, the mother was four to five months pregnant when she slipped on a defect in a town highway and fell. 138 Mass at 14. The fall brought on a miscarriage, and the infant survived its premature birth only briefly. *Id.* at 15. When the administrator of the child's estate brought a claim against the town for negligently maintaining the highway, the court dismissed the claim on the ground that the common law did not recognize a civil cause of action for injuries "received by [a child] while in its mother's womb." *Id.*

---

[14] Blackstone notes:

"[I]t hath been solemnly resolved, that *mala praxis* is a great misdemeanor and offence at common law, whether it be for curiosity and experiment, or by neglect; because it breaks the trust which the party had placed in his physician, and tends to the patient's destruction. Thus also, in the civil law, neglect or want of skill in physicians and surgeons[.]"

William Blackstone, 3 *Commentaries on the Laws of England* 122 (1768).

In reaching that conclusion, the court focused primarily on distinguishing English authorities that had recognized criminal liability for injurious acts directed at an unborn child and also certain property rights in unborn children. *Id.* at 15-17. Essentially, the court explained that the reasons for imposing criminal liability for injuring unborn children and for recognizing certain property rights in unborn children did not warrant extending civil liability for a negligent breach of the general standard of care. *Id.* Beyond that, the court offered three reasons for not recognizing a cause of action for negligence. It noted initially that "no case, so far as we know, has ever decided that, if the infant survived, it could maintain an action for injuries received by it while in its mother's womb." *Id.* at 15.[15] It held out the possibility that any injury to a fetus that resulted from a negligent injury to the mother was too remote to be recoverable. *Id.* at 16-17. Finally, it reasoned that, "as the unborn child was a part of the mother at the time of the injury, any damage to it which was not too remote to be recovered for at all was recoverable by her." *Id.* at 17.

The facts in *Allaire* were essentially the same as those in *Dietrich*. The mother in *Allaire* suffered an injury during the course of her pregnancy as the result of an accident, and the physical injury to the mother had a consequential effect on the health of the child. *See Allaire*, 184 Ill at 361-62.[16] As the court phrased the issue in *Allaire*, the question was whether the child, "at the time of the alleged injury, in contemplation of the common law, [had] such distinct and independent existence that he may maintain the action, or was he, in the view of the common law, a part of his mother." *Id.* at 365. The court stated that, if the injury occurred while the child was part of the mother, the child could not

---

[15] Because the child in *Dietrich* had been born alive, the court did not invoke common-law cases for the proposition that a stillborn child does not have a civil cause of action, nor did the court invoke the common-law rule that a tort claim does not survive the decedent's death, *cf. Hughes*, 344 Or at 152 (reasoning that, in 1857, the common law did not recognize wrongful death actions).

[16] The complaint in *Allaire* alleged that the mother had gone to a hospital 10 days before the expected birth of her child. While riding in an unenclosed elevator, she suffered an accidental injury, and the injury to the mother resulted in a consequential injury to the fetus, which was delivered sometime after the injury to the mother.

maintain an action. The court explained that, "if [the child was] a part of his mother [when the injury occurred, then] the injury was to her and not to the [child]." *Id.*

In considering that issue, the court quoted the passage from *Dietrich* that explained that, because the unborn child was part of the mother, "any damage to [the child] which was not too remote to be recovered for at all was recoverable by her." *See id.* at 366 (quoting *Dietrich*, 138 Mass at 17). The court also cited a case from the Irish courts, *Walker v. Great Northern Railway Co.*, 28 LR Ir 69 (1890), which had held that a child had no cause of action for a railroad's negligence because the railroad owed a duty to the mother but not to her unborn child. *See Allaire*, 184 Ill at 366.[17] Having noted the rationales in both *Dietrich* and *Walker*, the court in *Allaire* took a more categorical approach to the issue. It asked whether the child was "part of the mother" when the injury occurred, and it answered that question by positing "[t]hat a child before birth is, in fact, a part of the mother and is only severed from her at birth." *Id.* at 368. Because the child in *Allaire* had been part of the mother at the time of the injury, the court concluded that the child had no cause of action against the defendant.

The question in both *Dietrich* and *Allaire* was whether a child could bring a cause of action for a negligently inflicted injury to its mother during the course of her pregnancy that resulted in a consequential injury to what was, at the time of the injury, a fetus.[18] Neither case presented the issue that this case does; that is, neither case addressed whether a defendant's negligence that directly

---

[17] In *Walker*, the mother was injured as a result of the railroad's negligence, with consequential injuries to the child she was carrying. In a series of seriatim opinions, the court held that the child, once born, had no cause of action against the railroad. The common rationale was that the railroad owed a duty only to the mother, the person whom it had contracted to carry, and, as a result, owed no duty to the unborn child.

[18] The decisions from other states that followed *Dietrich* and *Allaire* arose out of a similar fact pattern. All the cases address negligently inflicted injuries to the mother during the course of the pregnancy that had a consequential effect on the fetus. *See, e.g.*, *Buel v. United Rys. Co.*, 248 Mo 126, 154 SW 71 (1913); *Nugent v. Brooklyn Heights R.R.*, 154 AD 667, 139 NYS 367 (1913); *Lipps v. Milwaukee Elec. Ry.*, 164 Wis 272, 159 NW 916 (1916); *Drobner v. Peters*, 194 AD 696, 186 NYS 278 (1921). *See generally* David A. Gordon, *The Unborn Plaintiff*, 63 Mich L rev 579 (1965).

causes an independent physical injury to the child during delivery was actionable at common law. Both the timing of the injury and the relationship between the defendant's negligence and the injury distinguish this case from *Dietrich* and *Allaire*. On the first point, we note that the injury that Braedon sustained did not occur while he was in his mother's womb. Not only had delivery begun when Braedon suffered an injury as a result of defendant's negligence, but the trial court could have found that Braedon's head had emerged from his mother's body when the injury occurred. Simply as a matter of categorization, it is difficult to say that Braedon was "part of the mother" at the time of the injury.

Additionally, the considerations that underlay the categorization that *Dietrich* invoked and on which *Allaire* placed greater reliance—that the child was "part of the mother" at the time of the injury—are absent here. This is not a case in which the harm that Braedon sustained as a result of defendant's negligence was too remote to be actionable, as the court concluded the child's injury was in *Dietrich*. Rather, as explained above, the direct and foreseeable consequence of defendant's earlier failure to advise mother of the risks of a vaginal delivery was that Braedon's shoulder would become stuck behind his mother's pubic bone during delivery and that he would suffer a brachial plexus injury as a result. Similarly, this is not a case in which, as in *Walker*, the defendant owed no duty to Braedon. It would be difficult to say that the obstetrician, who at the time of Braedon's injury held his head in the palms of her hands, owed no duty of care to him. *See Mead*, 352 Or at 277 (describing when a physician ordinarily owes a duty of care to a patient). Finally, defendant's negligence resulted in a physical injury only to Braedon, and not to his mother. Without a physical injury to the mother, it is difficult to bring this case within the reasoning of *Allaire*, which appeared to view the fact that the "injury was to [the mother] and not to [the child]" as synonymous with its conclusion that the child was "part of the mother" when the injury occurred. *See Allaire*, 184 Ill at 365.

To the extent that *Dietrich* and *Allaire* carve out an exception from the general principle that actions for negligence

and medical malpractice were recognized causes of action when Oregon adopted its constitution in 1857, they carve out an exception for negligent acts that cause physical injury to the mother and a consequential injury to the fetus during the course of the mother's pregnancy. The injury that occurred here does not come within the scope of the exception those cases recognized.

One final point deserves mention. The Oregon Court of Appeals held in *Christiansen* that, in 1857, the common law did not recognize an action for injuries an infant sustained during delivery. *See* 210 Or App at 292, 302.  Defendant commends *Christiansen*'s holding to us and quotes a passage from that decision in support of its position in this case. The difficulty with defendant's reliance on that passage is that the sources *Christiansen* cited in that passage do not do support the conclusion it reached.

The passage from *Christiansen* on which defendant relies cites two sources. *See* 210 Or App at 298. The first is *Allaire*, which we have already discussed. *Id.* The second is a 1971 annotation in the American Law Reports. Specifically, *Christiansen* cited two sections of that annotation for the proposition that an injury that occurs during delivery was not actionable in 1857. *See id.* (citing Roland F. Chase, Annotation, *Liability for Prenatal Injuries*, 40 ALR 3d 1222 § 1[a] n 5, § 2[a] (1971)). The first section that *Christiansen* cited merely defines the scope of the annotation, which surveys cases from 1884 to 1971. *See* 40 ALR 3d 1222 § 1[a] n 5. That section does not purport to describe the injuries that were actionable in the nineteenth century. The second section of the annotation that *Christiansen* cited discusses briefly the "[h]istorical development of law of prenatal injuries." *Id.* § 2[a]. That section of the annotation describes the holdings in *Dietrich* and *Allaire*, but does not say that those decisions apply to injuries that a child sustains independently during delivery. In our view, the passage on which defendant relies provides no persuasive support for the conclusion that *Christiansen* reached and that defendant urges us to adopt.

We assume, for the purposes of deciding this case, that *Dietrich* and *Allaire* carve out an exception to the

general principle that negligence and medical malpractice were recognized causes of action in 1857; that is, we assume that those decisions stand for the proposition that, in 1857, a child would not have had a cause of action for physical injuries to the mother during the course of her pregnancy that resulted from a breach of the general standard of due care and that had only a consequential effect on what was, at the time of the injury, a fetus. Those decisions, however, do not stand for the proposition that a defendant's negligence that directly causes a physical injury only or primarily to the child during delivery was not actionable at common law. Those decisions neither address that issue nor provide a basis for saying that that class of cases was excepted from the general rule that negligence and medical malpractice were recognized causes of action in 1857 for which a jury trial was available.[19]

We acknowledge, as we must, that neither party has cited any nineteenth-century case that addresses the specific question that this case presents, nor have we found any. That is, we are not aware of any nineteenth-century case that discusses one way or the other whether a child could maintain a cause of action for medical malpractice for independent physical injuries that the child sustains during delivery as a direct consequence of the defendant's acts or omissions. Whatever the reason for that absence of authority, our precedents require us to decide whether a cause of action for the injuries Braedon sustained was recognized in 1857. Faced with that question, we follow the general principle that actions for medical malpractice and negligence were recognized in 1857 unless we are persuaded that an action comes within an exception to that rule. For the reasons explained above, we are not persuaded that the injuries that Braedon sustained come within the exception that defendant has identified.

Having decided that question, we turn to our cases under Article I, section 17, to resolve this case. In *Lakin v.*

---

[19]  In holding that the common law would have recognized a cause of action for the injuries that Braedon sustained, we do not imply that, in 1857, the common law also would have recognized a cause of action for an infant who was stillborn or who died as a result of the defendant's actions. *See* n 15 above. That issue is not before us, and we express no opinion on it.

*Senco Products Inc.*, 329 Or 62, 78, 987 P2d 463 (1999), the court held that applying a legislative cap to reduce a jury's determination of noneconomic damages violates Article I, section 17, in "civil cases in which the right to jury trial was customary in 1857." Although the court has stated, since *Lakin*, that "Article I, section 17, is not a source of law that creates or retains a substantive claim or a theory of recovery in favor of any party," *see Jensen v. Whitlow*, 334 Or 412, 422, 51 P3d 599 (2002), we have adhered to *Lakin*'s holding that:

> "Article I, section 17, guarantees a jury trial in civil actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857 and in cases of like nature. In any such case, the trial of all issues of fact must be by jury. The determination of damages in a personal injury case is a question of fact. \*\*\* The legislature may not interfere with the full effect of a jury's assessment of noneconomic damages, at least as to civil cases in which the right to jury trial was customary in 1857[.]"

329 Or at 82.

Because an action for medical malpractice is one for which "the right to jury trial was customary in 1857," Article I, section 17, prohibits the legislature from limiting the jury's determination of noneconomic damages. *See id.*; *see also Hughes*, 344 Or at 156 (recognizing that Article I, section 17, prohibits the legislature from modifying jury awards in actions that were recognized in 1857). It follows that applying ORS 31.710(1) to the jury's damages award in this case violates that constitutional guarantee. Having reached that conclusion, we need not address plaintiffs' arguments under Article I, section 10, or Article VII (Amended), section 3. Specifically, we need not decide whether, under *Howell v. Boyle*, 353 Or 359, 298 P3d 1 (2013), the $500,000 limit on noneconomic damages provided plaintiffs with a substantial remedy within the meaning of Article I, section 10.

The decision of the Court of Appeals is reversed in part and affirmed in part. The judgment of the circuit court is affirmed.

**LANDAU, J.,** concurring.

The court's decision in this case turns on whether the common law in 1857 would have recognized plaintiff's claim. I do not quarrel with that. The sort of imaginative reconstruction of nineteenth-century case law in which the court engages is precisely what its precedents require. My quarrel is with those precedents.

I am skeptical of those precedents in two respects. First, at a more general level, I contest the notion that this state's constitution today means no more than what it meant in 1857. That proposition is at the core of the controlling decisions in this case—*Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 23 P3d 333 (2001), and *Hughes v. PeaceHealth*, 344 Or 142, 178 P3d 225 (2008), in particular. In my view, the sort of hyper-originalism that those decisions both require and purport to reflect is untenable. As I argued in my concurring opinion in *State v. Hemenway*, 353 Or 129, 154, 295 P3d 617 (2013), *vacated by State v. Hemenway*, 353 Or 498, 302 P3d 413 (2013), there is little evidence that the framers of the Oregon Constitution intended that their intentions or understandings would be forever controlling. Even assuming that the framers' intentions or understandings are controlling, the fact remains that those intentions or understandings are often unknowable or are unknown to us. And even in those cases in which they are known, it is often impossible to apply those intentions or understandings to modern circumstances without transforming them in ways that would have been utterly foreign to the framers.

Second, I have my doubts about the controlling decisions themselves. That is to say, even assuming for the sake of argument that the Oregon Constitution means only what it was intended to mean in 1857, I question whether the framers intended the interpretations that this court adopted in *Smothers* and *Hughes*.

I begin with *Smothers*. In that case, this court concluded that the exclusive remedy provision of the state workers' compensation statute violated the remedy clause of Article I, section 10, of the Oregon Constitution. In the

view of the court, "the drafters of Article I, section 10, sought to give constitutional protection to absolute rights respecting person, property, and reputation as those rights were understood in 1857." 332 Or at 115. The purpose of the remedy clause, the court stated, was to preserve from legislative abolition rights that had become "vested" as of the time of the adoption of the constitution. *Id*. at 116.

The court acknowledged that *direct* evidence of what the framers of the Oregon Constitution intended "admittedly is sketchy." 332 Or at 114. In fact, the court found no discussion of Article I, section 10, in the records of the constitutional convention.[1] The court nevertheless concluded that, by the mid-nineteenth century, there had developed a well-established understanding about what constitutional remedy guarantees meant, and nothing in the historical record suggested that the framers of the Oregon Constitution intended to depart from that understanding. *Id*.

Based on that historical analysis, the court concluded that, to determine whether a statute violates the remedy clause guarantee entails a two-part inquiry: To begin with, it must be determined, "when the drafters wrote the Oregon Constitution in 1857, did the common law of Oregon recognize a cause of action for the alleged injury?" *Id*. at 124. If the answer to that question is no, the inquiry

---

[1] The closest thing to direct evidence about the intended meaning of Oregon's remedy clause, the court explained, was the rewording of the clause—without explanation—from the Indiana provision on which it was based. 332 Or at 113-14. Article I, section 12, of the Indiana Constitution provided:

"All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."

A committee on the Bill of Rights apparently reworked the phrasing so that Article I, section 10, of the Oregon Constitution provides:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

The court found significant that the revised version "expressed in a separate, independent clause the guarantee of remedy by due course of law." 332 Or at 114. Of course, the remedy guarantee was expressed in a separate, independent clause in the original Indiana version, as well. The framers of the Oregon version simply moved the independent clause of the Indiana version to a different place in the sentence.

is at an end. If the answer is yes, and the legislature has abolished that common-law claim, then "the second question is whether [the legislature] has provided a constitutionally adequate remedy for the common-law cause of action for that injury." *Id.*

Applying that test to the exclusive remedy statute at issue, the court in *Smothers* answered the first question in the affirmative—that is, the court concluded that, in 1857, the common law recognized a claim by an employee against an employer for negligent injury during employment. And it answered the second question in the negative—that is, the substitution of workers' compensation for common-law negligence claims was constitutionally inadequate because the more rigorous causation standard that applies to workers' compensation claims left some claims that would have been compensable at common law beyond remedy. *Id.* at 133-34.

The court's historical analysis is the focus of my concern. It appears to me that, in a number of important respects, the court's analysis in *Smothers* is difficult to reconcile with the historical record.

In brief, the court in *Smothers* traced the origins of the remedy clause to Magna Carta, as explained by Coke and Blackstone; as informed by the common-law maxim *ubi jus, ibi remedium* (where there is a right, there must be a remedy); and as taken up by nineteenth-century constitution framers who were hostile to legislative authority. 332 Or at 94-112. As far as I can tell, pretty much everyone agrees with the initial proposition that state remedy clauses have their genesis in section 29 of the 1225 version of Magna Carta, which provides that,

> "No freeman shall be taken, or imprisoned, or be disseised of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed; nor will we not pass upon him, nor condemn him, but by lawful judgment of his peers, or by the law of the land. We will sell to no man, we will not deny or defer to any man either justice or right."

So far, so good.

The court gets into trouble, however, in its reading of Coke's commentary on the final sentence of Chapter 29.

According to the *Smothers* court, "Coke asserted that the common law of England had come to guarantee every subject a legal remedy for injury to goods, lands, or person caused by any other subject." 332 Or at 96-97. The court cited no authority for that characterization of Coke's take on that portion of Magna Carta. As far as I can tell, there is no authority for it.

What Coke was writing about was royal—that is, the king's—interference with the judiciary. David Schuman, *The Right to a Remedy*, 65 Temple L rev 1197, 1200 (1992) ("At the time of Magna Carta, the evil was corrupt courts."). The immediate context within which Coke wrote his commentary bears out the point. King James I, as absolute monarch, had asserted the authority to appoint or remove judges at his pleasure and to influence their decisions at will. *See generally* William S. Holdsworth, 5 *A History of English Law* 423-56 (1924) (on the conflict between the king and Coke concerning crown control of the courts). Coke asserted that the common law took precedence over the authority of the king.[2] In that context, he wrote in the *Second Institutes* that

---

[2] As Holdsworth explained, the dispute between Coke and King James I was part of a larger one over the nature of sovereign power in post-Tudor England. The courts "naturally magnified the royal prerogative on which they leaned and to which they owed their authority. They therefore gravitated to the royalist view" of the state. Holdsworth, 5 *A History of English Law* at 423-24. On the other hand, the medieval common-law view was that "the law was supreme, and the [royal] prerogative was therefore limited by it. The common lawyers therefore gravitated to the parliamentary view that the prerogative was subject to definite legal limitations." *Id.* Coke was of the latter, parliamentary, view. *Id.* In Coke's view, "the common law was the supreme law in the state, and the judges, unfettered and uncontrolled save by the law itself, were the sole exponents of this supreme law." *Id.* at 428. In James I's view, "the judges were, like other civil servants, the officers of the crown. The crown could therefore supersede them if necessary, and decide any matter for itself." *Id.*; *see also* Catherine Drinker Bowen, *The Lion and the Throne: The Life and Times of Sir Edward Coke* 294 (1956) (The king's position—articulated by Lord Chancellor Ellesmere and Archbishop Bancroft, respectively—was "*rex est lex loquens*," that is, "the King is the law speaking." Judges were "lions, but yet lions under the throne, being circumspect that they do not check or oppose any points of sovereignty."). James I asserted just that authority when, for example, he attempted to interfere with ongoing proceedings in the common-law courts. Holdsworth, 5 A *History of English Law* at 438-40. Coke was ultimately dismissed from the bench over the controversy. Meanwhile, James I and his successor, Charles I, continued to remove judges who refused to do the bidding of the crown. *See generally* J. H. Baker, *An Introduction to English Legal History* 167 (4th ed 2002).

> "every subject of this realme, for injury done to him in *bonis, terris vel persona*, by any other subject, be he ecclesiastical, or temporall, free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any deniall, and speedily without delay."

Edward Coke, *The Second Part of the Institutes of the Laws of England* 55 (1797). The quote responds to the abuses of the king, including the sale of justice, corrupt appointments, and interference with judicial decisions. *See generally* Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or L rev 1279, 1288 (1995) ("Royal interference with the common-law courts incited Sir Edward Coke's fight with the Crown and inspired his reinterpretation of Magna Carta in his *Second Institute*."). It was about who was entitled to justice from the courts—*everyone*, regardless of class or station—and how remedies are to be administered under law—"freely without sale, fully without any deniall, and speedily without delay." Nothing in the historical context of Coke's *Second Institutes* suggests that his point was that the courts were the guardians of a substantive right to remedy against intrusions *by Parliament*. To the contrary, corrupt *courts* were the problem for Coke. *Smothers*, in suggesting that Coke was about protecting against legislative interference with common-law remedies, turns Coke on his head, transforming his discussion about royal corruption of courts into a declaration of rights as against parliamentary interference.

The court also runs into trouble in its appeal to Blackstone's *Commentaries*. According to the court *in Smothers*,

> "Blackstone explained that the common law viewed Englishmen as having both absolute and relative rights. *** Absolute rights are founded on immutable laws of nature and reason, and usually are called liberties.

> "*****

> "Blackstone echoed Coke in stating that it would be 'in vain' for the law to recognize rights, if it were not for the remedial part of the law that provides the methods for

> restoring those rights when they wrongfully are withheld or invaded."

332 Or at 98-99 (citations omitted).

Once again, the court appears to have extracted quotations from their context and summarized them to stand for something that would have been foreign to their source. Certainly, Blackstone spoke of absolute rights. The entire first chapter of Book I of his *Commentaries* concerns "the absolute rights of individuals." William Blackstone, 1 *Commentaries* \*117. But Blackstone viewed absolute rights as such only in a state of nature. *Id.* at \*119 ("By the absolute rights of individuals we mean those which are so in their primary and strictest sense; such as would belong to their persons merely in a state of nature."). He did not regard them as absolute in the sense of being immune from change or limitation by the legislature. *See* Albert W. Alschuler*, Rediscovering Blackstone*, 145 U Pa L rev 1, 28 (1996) (Blackstone did not "view rights within political communities as 'absolute' in the sense that they were unqualified or unrestricted."); Bradley J. Nicholson, *A Sense of the Oregon Constitution* 209 (2011) (http://www.asenseoftheoregonconstitution.com) ("[D]espite Blackstone's characterization of particular rights as 'absolute,' they always were subject to legislative alteration.").

To the contrary, Blackstone explicitly stated that even so-called "absolute rights" were subject to regulation by Parliament in the public interest. *See, e.g.*, Robert P. Burns, *Blackstone's Theory of the "Absolute" Rights of Property*, 54 U Cinn L rev 67, 73 (1985) (In Blackstone's view, "absolute rights may be curtailed by necessary sacrifices, imposed by positive law, for the blessings of civilized society."); Jeffrey D. Jackson*, Blackstone's Ninth Amendment: A Historical Common Law Baseline for the Interpretation of Unenumerated Rights*, 62 Okla L rev 167, 208 (2010) (Absolute rights, to Blackstone, "are not 'absolute' in all applications. Rather, they are bound by 'the laws of the land,' that is, by the valid laws enacted to protect and regulate society."). In Blackstone's view, we relinquish some of our absolute rights when we become members of a political community. Blackstone, 1 *Commentaries* at \*121 ("But every man, when

he enters into society, gives up a part of his natural liberty."). As a result, otherwise absolute rights give way to laws that are "necessary and expedient for the general advantage of the publick." *Id.* Thus, Blackstone cautions that, although the rights are denominated "absolute," they are subject "at times to fluctuate and change: their establishment (excellent as it is) being still human." *Id.* at *123. To Blackstone, the common law was not frozen; rather, Parliament possessed authority to enlarge "the common law where it was too narrow and circumscribed" and "restrain[] it where it was too lax and luxuriant." *Id.* at *86-87.

To say then, as *Smothers* does, that Blackstone asserted a common-law right to a remedy superior to legislative authority is quite at odds with what Blackstone actually said. *See* Thomas R. Phillips, *The Constitutional Right to a Remedy*, 78 NYUL rev 1309, 1323 (2003) ("Blackstone clearly saw the remedies guarantee only as a check on royal and other 'private' abuses of power, not parliamentary excess."); Nicholson, *A Sense of the Oregon Constitution* at 208 ("[C]onsistent with the scope of the 18th-century doctrine of parliamentary supremacy, * * * Blackstone apparently believed that parliament was more trustworthy than the judiciary.").

In a related vein, the court runs into further problems in invoking the hoary *ubi jus* maxim.[3] According to the *Smothers* court, "the purpose of the remedy clause is to make the common-law maxim that there is no wrong without a remedy a 'fixed and permanent rule in this state.'" 332 Or at 115. As authority for that proposition, the court cited its own decision in *Platt v. Newberg et al.*, 104 Or 148, 153, 205 P 296 (1922), which, in turn, cited the *Corpus Juris Secundum*, which simply stated that state remedy clauses trace to Magna Carta. In fact, I am aware of no support

---

[3] Reference to the *ubi jus* maxim dates back at least to the early eighteenth century. The English decision in *Ashby v. White*, 92 Eng Rep 126 (1703), is often cited as the leading opinion. Blackstone certainly discussed it. Blackstone, 1 *Commentaries* at *55-56. It was also famously invoked in *Marbury v. Madison*, 5 US 137, 163 (1803) ("[W]here there is a legal right, there is also a legal remedy by suit or action at law whenever that right is invaded."). There has been some suggestion that *Ashby v. White* has been misunderstood, as a result of an eighteenth century publication mishap, and that the decision actually rejected the principle. *See* Ted Sampsell-Jones, *The Myth of* Ashby v. White, 8 U St Thomas LJ 40, 40 (2010).

for the notion that state remedy clauses were intended to effectuate the ancient *ubi jus* maxim.

It appears that the maxim had an entirely different purpose. It was cited by early common-law courts as authority for courts to create remedies where statutes proved inadequate. *See generally* Jonathan M. Hoffman, *Questions Before Answers: The Ongoing Search to Understand the Origins of the Open Courts Clause*, 32 Rutgers LJ 1005, 1010 (2001) ("[W]hatever its source, the Maxim was historically applied to *effectuate* legislative policy, not to thwart it." (Emphasis in original.)). Thus, if statutes did not provide a remedy for a given wrong, courts regarded themselves as empowered to supply the needed remedy. That, at least, is how mid-nineteenth-century cases viewed the maxim. *See, e.g.*, *Stearns v. Atlantic & St L R Co*, 46 Me 95, 102 (1858) ("But the absence of all statutory remedy compels the plaintiff to rely upon common law authority for bringing an 'action upon the case.'"). It was cited as authority for courts to *add to* the legislature's exercise of its lawmaking authority. I can find no authority for the proposition that the maxim operated *to prevent* legislatures from exercising their authority to modify or eliminate common-law remedies, which is another matter entirely.

The *Smothers* court encounters additional trouble in relying on the framers' "mistrust of legislative power" as a basis for its reading of the remedy clause of Article I, section 10. To be sure, mid-nineteenth-century framers of state constitutions mistrusted legislative power. *See generally* Kermit L. Hall, *The Magic Mirror: Law in American History* 89, 103-05 (1989) ("The populist and antigovernmental stirrings of the late 1840s and 1850s climaxed in an outburst of constitutional reform that diminished legislative power."). But that mistrust had specific focus in response to specific past abuses of legislative power—in particular, corruption in the legislative process and lack of deliberation on the passage of laws, *see generally* Robert F. Williams, *State Constitutional Limits on Legislative Procedure*, *reprinted in* 48 U Pitt L rev 797 (1987); adoption of laws that transferred large swaths of land by fiat, *see generally* James Willard Hurst, *The Growth of American Law: The Law Makers* 241-42 (1950); Mark A.

Graber, *Naked Land Transfers and American Constitutional Development*, 53 Vand L rev 71 (2000); and other laws that granted special privileges and immunities to favored individuals or businesses, *see generally* G. Alan Tarr and Robert F. Williams eds., *State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform* 21 (2006) ("A number of states include in their constitutions a curb on granting 'special' or 'exclusive' privileges, after a series of abuses by the relatively unfettered state legislatures responding to powerful economic interests."); Kurt T. Lash, *The Origins of the Privileges or Immunities Clause, Part I: "Privileges and Immunities" as an Antebellum Term of Art*, 98 Geo LJ 1241, 1253 (2010); David Schuman, *The Right to "Equal Privileges and Immunities": A State's Version of "Equal Protection,"* 13 Vt L rev 221, 223 (1988). Those abuses led to the adoption of enactment requirements that promoted openness and deliberation, as well as prohibitions on local and special laws and other forms of legislative favoritism.[4]

I have searched the historical record in vain for any suggestion that the abuses of mid-nineteenth-century legislatures also included the enactment of laws that encroached on common-law tort remedies. *Smothers* certainly identified none. That such is the case, again, is understandable when the historical context is more fully taken into account. The mid-nineteenth century, after all, was no friend to those seeking recovery for injury. The law of negligence was in its infancy. Lawrence Friedman, *A History of American Law* 222 (3d ed 2005) (in the nineteenth century, "[n]egligence was the merest dot on the law"); Morton J. Horowitz, *The Transformation of American Law 1870-1960* 85 (1977) ("One is surprised to learn how really late it was in the nineteenth

---

[4] As Professor G. Alan Tarr explains in his leading treatise on state constitutions, beginning in the 1830s, state constitution makers imposed restrictions on legislatures, principally to address problems of corruption. G. Alan Tarr, *Understanding State Constitutions* 118 (1998). The constitutional limitations tended to focus on process, requiring supermajorities, multiple readings, title requirements, single-subject limitations, and the like. *Id.* at 118-19. Later, in the period from 1840-70, the focus shifted to legislative favoritism, resulting in requirements of equal taxation and bans on special corporation acts, among other things. *Id.* "Most restrictions," Tarr explains, "were designed to combat special privilege and the threat of corruption by forbidding legislators from enacting special or local laws in specific areas of public policy." *Id.* at 120.

century before the action for negligence became a significant factor in American law.").[5] The law was dominated by doctrines that favored railroads and industry. Under the prevailing "fellow servant rule" and its cousin, assumption of risk, employees could almost never sue their employers for workplace injuries.[6] Contributory negligence precluded recovery if a plaintiff were at fault in the slightest way. *See Lawson v. Hoke*, 339 Or 253, 262, 119 P3d 210 (2005) (noting

---

[5] The first treatise on the subject of torts did not appear until 1859. Francis Hilliard, *The Law of Torts or Private Wrongs* (1859) (the first printed text on torts). As late as the 1870s, Oliver Wendell Holmes remarked that torts "is not a proper subject for a law book," as it simply amounted to a collection of unrelated writs. O. W. Holmes, *Book Notice*, 5 Am L rev 340, 341 (1871). As Professor G. Edward White noted in his leading treatise on the history of the development of tort law in this country, "[t]he emergence of Torts as an independent branch of law came strikingly late in American legal history." G. Edward White, *Tort Law in America: An Intellectual History* 3 (2003). Torts, he explained "was not considered a discrete branch of law until the late nineteenth century." *Id.*

[6] Courts held that risks resulting from a dangerous place of employment were incident to employment and addressed in the worker's rate of pay. An employee could sue an employer only for the employer's personal misconduct, which, given the realities of nineteenth-century industrial organization, made that possibility essentially meaningless. *See generally* Lawrence M. Friedman and Jack Ladinsky, *Social Change and the Law of Industrial Accidents*, 67 Colum L rev 50, 53 (1967) ("An employee retained the right to sue the employer for injuries, provided they were caused by the employer's personal misconduct. But the factory system and corporate ownership of industry made this right virtually meaningless.").

The law was famously described by Chief Justice Shaw in *Farwell v. Boston & W. R. Corp.*, 45 Mass 49, 59-60 (Mass 1842), in which he explained that, "[t]he general rule, resulting from considerations as well of justice as of policy, is, that he who engages in the employment of another for the performance of specified duties and services, for compensation, takes upon himself the natural and ordinary risks and perils incident to the performance of such services, and in legal presumption, the compensation is adjusted accordingly." *See also* Comment, *The Creation of a Common Law Rule: The Fellow Servant Rule, 1837-1860*, 132 U Pa L rev 579, 590-95 (1984) (describing *Farwell* and its rapid adoption by most courts).

Some courts adopted exceptions to the rules barring negligence claims against employers. For example, courts created an exception for employers who supplied faulty tools, *see, e.g.*, *Flike v. Boston & A.R. Co.*, 16 Am Negl Cas 765 (NY 1873) ("The master is liable if his own negligence or want of care produces the injury, and this may be manifested by * * * furnishing improper or unsafe machinery, implements, facilities or materials for the use of the servant."), and another, known as the "vice-principal exception," that applied to certain supervisory employees whose responsibilities were such that the courts regarded them as, in effect, the employee, *see, e.g.*, *Berea Stone Co. v. Kraft*, 31 Ohio St 287, 291-92 (1877) (The fellow servant rule, "has no application where the servant by whose negligent conduct or act the injury is inflicted, sustains the relation of superior in authority to the one receiving the injury."). But such exceptions did not arise until later, in most cases, years after the adoption of the Oregon Constitution. *See generally* Peter Karsten, *Heart versus Head: Judge-Made Law in Nineteenth-Century America* 122-124 (1997) (describing adoption of various exceptions to fellow-servant rule from 1860s to 1880s).

"the indisputable proposition that, in the early years of this state's history, a plaintiff's contributory negligence was an absolute bar to recovery for the negligent acts of another"). The "spirit of the age," as Friedman put it, "was a spirit of limits on recovery." *A History of American Law* at 352. And those limits on recovery "[a]ll had either been invented or refined by the judges themselves." *Id.* at 356.[7]

---

[7] For that reason, it is especially difficult to understand the court's application of its new interpretation of the remedy guarantee to the question whether the common law in 1857 recognized negligence claims by employees against employers. The court in *Smothers* declared that, "in 1857, the common law of Oregon would have recognized that a worker had a cause of action for negligence against his employer for failing to provide a safe workplace." 332 Or at 131. Yet the court found not a single antebellum case to support that proposition.

That is hardly surprising, given the state of the law at the time. As I mentioned, it was all but impossible to recover against an employer for injuries negligently inflicted in the workplace. How, then, could *Smothers* conclude that "in 1857, the common law of Oregon would have recognized that a worker had a cause of action for negligence against his employer for failing to provide a safe workplace"? 332 Or at 131. In brief, the court cited several cases from the 1870s and 1880s that recognized *exceptions* to the rule of nonliability, without acknowledging the rule itself.

For example, the court relied heavily on an 1880 United States Supreme Court decision, *Hough v. Texas and Pacific R.R. Co*, 100 US 213, 25 L Ed 612 (1879), which it said recognized a "firmly established" rule that employers were obligated by law to provide a safe workplace. 332 Or at 129-30. A careful reading of *Hough*, however, reveals a different picture. In that case, the United States Supreme Court expressly recognized "the general rule exempting the common master from liability to one servant for injuries caused by the negligence of a fellow-servant in the same employment." 100 US at 215. The Court quoted extensively from Chief Justice Shaw's opinion in *Farwell* and commented that, "[a]s to the general rule, very little conflict of opinion is to be found in the adjudged cases." *Id.* at 216. Indeed, the Court said, "the general doctrine, as stated by Chief Justice Shaw, is sustained by elementary writers of high authority, and by numerous adjudications of the American and English courts." *Id.* The Court then went on to note a recently recognized *exception* to the general rule, that employers were obliged to "provid[e] the servant with machinery or other instrumentalities adequately safe" for use in the workplace. *Id.* at 217. This is precisely one of the exceptions that I mentioned above, exceptions that were not adopted until the 1860s and 1870s.

In similar fashion, the court in *Smothers* quoted *Anderson v. Bennett*, 16 Or 515, 19 P 765 (1888), as holding that "an employer, and the employer's representatives, have a duty 'to use reasonable care and diligence and [to] make reasonable provision for the servant's safety.'" 332 Or at 131 (quoting *Anderson*, 16 Or at 532). The court conceded that *Anderson* was decided more than 30 years after the adoption of the constitution, but it regarded the decision as controlling nonetheless, because "nothing in the court's opinion in that case suggested that the holding was novel or that the decision marked a departure from any previous decisions or jurisprudence on the subject." 332 Or at 131. That appears to be incorrect.

The court in *Anderson* actually began its analysis by acknowledging the general rule and rationale from Shaw's *Farwell* decision: "The general doctrine that a master is not liable for the injuries caused by the negligence of a fellow-servant

In that context, I have to wonder where the idea originated that the framers wanted judges to act as restraints on legislative abrogation of common-law remedies. The robust common-law remedies with which we are so familiar today barely existed at the time, and it was the judges who were adopting constraints on them.

The problems with *Smothers* that I have described do not appear to be mere disagreements about subtle issues of historical interpretation that are of idle academic interest. Recall that the court in *Smothers* acknowledged an absence of direct evidence of what the Oregon framers intended the remedy clause to mean. The linchpin of its decision was its construction of a settled understanding of what remedy clauses meant to mid-nineteenth-century framers. The court then read the silence of the record as to the particular intentions of the Oregon framers as, in effect, acquiescence in that settled understanding. 332 Or at 114 ("[W]e find no indication that the drafters sought to depart from the historical purpose of remedy clauses.").

The problem is that the court did not make its case for a settled understanding of state remedy clauses. The matter is, at best, debatable. Indeed, what scholarship on

---

engaged in the same common employment is now regarded as part of the common law of this land." 16 Or at 520. But, after acknowledging the general rule, the court explained that more recent decisions have retreated from that harsh rule in the interests of justice:

"But in the progress of society since the decision in *Farwell v. Railroad Co.* such has been the increase in the number and magnitude of the business operations of the country, the great army of servants required to be employed to perform their work, and the necessity of placing over them, and in charge of these vast operations, other servants to direct and control their labor, that there has been wrought in the judicial mind the conviction that the general application of that rule in such cases has often worked manifest injustice and hardship. *So that the later current of judicial decision *** indicates a marked departure from that rule*, and a disposition to so limit and restrict it as shall make the master answerable for his just share of responsibility to his servant for injuries sustained in his employment."

16 Or at 522 (emphasis added). In that context, the court then recognized the development of the vice-principal exception to the fellow-servant rule and the obligation of the employer to furnish a safe place of employment. *Id.* at 528.

Thus, in both cases, it appears that *Smothers* failed to acknowledge what the authorities it cited actually said about the general rule of nonliability of employers and instead quoted from what those authorities identified as *exceptions* to that general rule—exceptions that were not widely recognized until after the adoption of the Oregon Constitution.

the subject exists suggests an absence of any consensus about what state remedy clauses were intended to mean. *See, e.g.*, Hoffman, 74 Or L rev at 1281 ("Research published to date reveals little more than that the provision comes from Magna Carta Chapter 40, as viewed through the lens of Sir Edward Coke's Second Institute.").[8] And, bearing out that very point, courts in states whose constitutions include remedy guarantees are divided about what the guarantees actually mean. Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims and Defenses* § 6.02[3] at 6-9 (4th ed 2006) ("[S]tate court decisions divide sharply on the central issue of whether (and how) these clauses do limit legislative attempts to alter remedies available under the common law.").

Aside from the fact that *Smothers* appears to rest on a shaky historical foundation, the decision does not appear to be working very well on its own terms, as our recent, sharply divided cases make clear. *See, e.g.*, *Howell v. Boyle*, 353 Or 359, 298 P3d 1 (2013). This court, in fact,

---

[8] There is little in the way of scholarship about the historical origins of remedy clauses. But, even within that small universe of scholarship, there is much disagreement. A number of authors take the position that the clauses were intended only to secure an independent, accessible judiciary. *See, e.g.*, Nicholson, *A Sense of the Oregon Constitution* at 194 (Article I, section 10, was intended "to provide every person with access to the courts to resolve private disputes, but does not guarantee a recovery or require that any particular rules of law shall apply."); Hoffman, 74 Or at 1318 ("Modern cases and commentaries interpreting this clause \*\*\* to forbid legislatures from modifying or eliminating existing remedies through duly enacted legislation[] are simply not consistent with the original purpose of the clause."); Daniel W. Halston, *The Meaning of the Massachusetts "Open Courts" Clause and Its Relevance to the Current Court Crisis*, 88 n 3 Mass L rev 122, 130 (2004) ("there is ample evidence that the clause, once placed in historical context, was actually intended to create and protect an independent judiciary"); Phillips, *The Constitutional Right to a Remedy*, 78 NYUL rev at 1309 (same). Others suggest—in my view, without much in the way of explanation—that the clauses were intended to limit legislative authority. *See, e.g.*, Comment, *The Kansas Remedy by Due Course of Law Provision: Defining a Right to a Remedy*, 47 U Kan L rev 655, 659 (1999) (the use of remedy clauses "to curtail legislative power remains true to the historical spirit of the provision as a means of preserving the common law"); William C. Koch, Jr., *Reopening Tennessee's Open Courts Clause: A Historical Reconsideration of Article I, section 17 of the Tennessee Constitution*, 27 U Mem L rev 333, 450 (state remedy clause limits legislative authority to abolish common-law remedies). Still others take a sort of middle position. Schuman, 65 Temple L rev at 1224-25. And still others suggest that there may be a constitutional right to a remedy, but only under a state or federal due process clause. *See, e.g.*, Tracy A. Thomas, *Restriction of Tort Remedies and the Constraints of Due Process: The Right to an Adequate Remedy*, 39 Akron L rev 975 (2006).

appears to have trouble even identifying—and agreeing about—what *Smothers* held. In *Lawson*, for example, the court concluded that, because the plaintiff's negligence claim was subject to various defenses at common law, it was not the sort of "absolute common-law right" that the remedy clause protects, 339 Or at 264-65. The court used the term "absolute" quite differently from the way *Smothers* used it and, in the process, significantly muddied the waters in this area of the law.

The difficulty is that *Smothers* explicitly holds that the scope of the remedy clause is limited to protecting common-law rights that vested in 1857. That is problematic in at least several ways.

First, if *Smothers* constitutionally protects claims that existed in 1857, it would seem to follow that its protection extends to some that can only be regarded as quaint artifacts of a time long gone by. For example, if *Smothers* means what it says, I do not understand how the legislature had the constitutional authority to eliminate a husband's common-law liability for the torts of his wife or such claims as the tort of alienation of affection. It should not be forgotten that, at the time of the adoption of the Oregon Constitution, women had limited legal rights, and some persons of color had none at all.

Second, if the remedy clause protects only those claims that "vested" in 1857, that turns out to be not much of a guarantee, given the state of the common law at that time. For example, as this court noted in *Howell*, at the time of the adoption of the Oregon Constitution, a plaintiff could not state a claim for negligence without affirmatively establishing a complete absence of contributory negligence. 353 Or at 382-85. The doctrine was not treated as a defense in this state until the mid-1880s. *See Grant v. Baker*, 12 Or 329, 332-33, 7 P 318 (1885) (first decision to treat contributory negligence as an affirmative defense). It would seem to follow that the remedy clause affords no relief to any twenty-first century plaintiff who was at fault in the slightest way.

Third, there is the unavoidable problem of determining the proper level of generality with which to describe and

analyze claims that may have existed at common law in 1857. For example, in *Lawson*, a motorist who was injured in a collision with another motorist argued that a statutory limitation on noneconomic damages when the injured party did not have automobile liability insurance violated her right to a remedy under Article I, section 10, because the statute abrogated claims for negligence, which clearly existed in 1857. The defendant argued that the remedy clause did not apply under *Smothers*, because claims for injury arising out of automobile accidents were not recognized in the mid-nineteenth century, automobiles not having been invented at the time. The plaintiff rejoined that, although automobiles had not yet been invented, Conestoga wagons had been, and the law would have recognized injuries arising out of such transportation-related accidents. This court ultimately held that neither party was correct and that the key determinant to the question whether the framers would have recognized a claim for the plaintiff's injuries in 1857 was the fact that she had failed to comply with the law that required her to obtain liability insurance. 339 Or at 260. It strikes me that there is no way to determine whether the remedy clause actually applies until this court identifies the proper level of generality with which to describe the nature of the claims that the common law in 1857 would or would not have recognized, and nothing in *Smothers* or any other case of which I am aware provides a principle of law that enables the bench and bar to predict what that proper level of generality is.

In that regard, it is worth noting that it is plaintiff in this case who suggests that we should depart from the rigid historical focus of *Smothers* and broaden the guarantee beyond those rights that existed in 1857. That simply will not work, however, at least not without completely rethinking the interpretation of the remedy clause. *Smothers* cannot just be tweaked as plaintiff suggests. Its very rationale is that certain rights vested at a point in time. 332 Or at 116 (under the remedy clause, "[v]ested rights are placed under constitutional protection, and cannot be destroyed by legislation." (quoting *Templeton v. Linn County*, 22 Or 313, 318, 29 P 795 (1892)). It is explicitly historical.[9]

---

[9] That is not based on a stray or incidental quote from the court's opinion. In *Smothers* the court stated nearly a dozen times that the drafters "sought to

My own view is that it is unlikely that the framers intended the remedy clause to serve as a limitation on legislative authority, certainly not one that essentially freezes the guarantee to preserve mid-nineteenth-century tort law. *See generally* [Brewer v. Dept. of Fish and Wildlife](), 167 Or App 173, 191-98, 2 P3d 418 (2000) (Landau, J., concurring). I am inclined to agree with what appears to be the majority of other state courts that have addressed the issue, which conclude that state remedy clauses are addressed to the courts, not the legislature, and that—consistently with mid-nineteenth-century antipathy to favoritism—its target is the accessibility of the courts by all, without discrimination.[10]

give constitutional protection to absolute rights respecting person, property, and reputation *as those rights were understood in 1857*," 332 Or at 115 (emphasis added), or similar phrasing. *See also, e.g.*, *id.* at 116 ("the purpose of the remedy clause 'is to save from legislative abolishment those jural rights which had become well established prior to the enactment of our Constitution.'" (quoting *Stewart v. Houk et al.*, 127 Or 589, 591, 271 P 998 (1928)); *id.* at 118 ("As we have explained, the history of the remedy clause indicates that its purpose is to protect absolute common-law rights respecting person, property, and reputation as those rights existed when the Oregon Constitution was drafted in 1857."); *id.* at 123 ("Article I, section 10, protects rights respecting person, property, and reputation that, in 1857, the common law regarded as 'absolute.'"); *id.* at 124 (remedy clause preserves claims for "injury," defined as "a wrong or harm for which a cause of action existed when the drafters wrote the Oregon Constitution in 1857"). It was, in fact, explicitly the basis for this court's holding in prior cases that certain modern claims are not subject to the remedy guarantee of Article I, section 10. *See Hughes*, 344 Or at 151-52 (remedy clause does not apply to claims for wrongful death, because such claims were not recognized at the time of the adoption of the Oregon Constitution).

[10] *See, e.g.*, *O'Quinn v. Walt Disney Productions., Inc.*, 177 Colo 190, 195, 493 P2d 344 (Colo 1972) (remedy clause "simply provides that if a right does accrue under the law, the courts will be available to effectuate such right"); *Hawley v. Green*, 117 Idaho 498, 500-01, 788 P2d 1321 (Idaho 1990) (remedy clause "merely admonishes the Idaho courts to dispense justice and to secure citizens the rights and remedies afforded by the legislature or by the common law"); *Smith v. Indiana Dept. of Correction*, 883 NE 2d 802, 808 (Ind 2008) ("the Open Courts Clause does not prevent the legislature from modifying or restricting common law rights and remedies"); *Crier v. Whitecloud*, 496 So 2d 305, 309-10 (La 1986) ("From this history [of the state open courts clause] we conclude that *** the Constitutional Convention did not intend to limit the legislature's ability to restrict causes of action or to bar the legislature from creating various areas of statutory immunity from suit. *** The constitutional guarantee providing for open courts and insuring a remedy for injuries does not warrant a remedy for every single injury."); *Meech v. Hillhaven West, Inc*., 238 Mont 21, 30, 776 P2d 488, 493 (Mont 1989) ("The history of the guarantee indicates that framers of state constitutions inserted remedy clauses to insure equal administration of justice. Clauses insuring equal administration of justice are aimed at the judiciary, not the legislature."); *Lamb v. Wedgewood South Corp*., 308 NC 419, 444, 302 SE2d 868 (NC 1983) ("the remedy constitutionally guaranteed must be one that is legally cognizable. The legislature has the power to define the circumstances under which a remedy is legally

But I make no claim that that view reflects any-thing close to settled law or history. Moreover, that view presupposes that the framers' intentions are controlling in the first place—a position that, as I have said, I contest. At this point, I am less invested in a particular interpretation of the clause than I am in having the matter served up for proper argument and reexamination.

I have similar reservations about *Hughes*, especially with respect to its incorporation of *Smothers*-type analysis into the interpretation and application of the right to a jury trial guaranteed by Article I, section 17, of the Oregon Constitution. At issue in *Hughes* was the constitutionality of a statutory limit on noneconomic damages in a wrongful death action. The plaintiff argued that the cap, among other things, violated her right to a remedy under Article I, section 10, and her right to a jury trial under Article I, section 17. As to the remedy clause claim, the court diligently applied *Smothers* and concluded that the remedy clause did not apply to wrongful death claims, because neither the common law nor the Oregon legislature recognized such claims until at least five years after the adoption of the state constitution. 344 Or at 146-52. Turning to the jury clause claim, the court similarly concluded that the plaintiff could not prevail "[b]ecause the common law does not, and did not in 1857, recognize a right to unlimited damages in wrongful death actions." *Id.* at 156-57.

Article I, section 17, provides that, "[i]n all civil cases the right of Trial by Jury shall remain inviolate." By its terms, it applies to "all civil cases," not just the limited number of civil cases that would have triggered a right to a jury trial in 1857. And I am aware of no evidence in the

cognizable and those under which it is not."); *Andrews v. O'Hearn*, 387 NW2d 716, 723 (ND 1986) ("[o]ur research shows that [the open courts clause of the state constitution] has been repeatedly construed as a guarantee of *access* to our State system of justice"); *Singer v. Sheppard*, 464 Pa 387, 400, 346 A2d 897 (1975) ("nothing in [the state constitution] prevents the legislature from extinguishing a cause of action"); *Nash v. Baker*, 522 P2d 1335, 1338 (Okl App 1974) (state open courts clause "does not promise a remedy to every complainant[;] *** [i]t does not prevent the Legislature from creating new legal rights *** or from increasing or reducing or changing the scope of such a right or the remedy for its violation"); *Quesnel v. Town of Middlebury*, 167 Vt 252, 258, 706 A2d 436, 439 (1997) (state open courts clause "does not create substantive rights[,] *** it merely provides access to the courts").

historical record that the framers of the provision intended or contemplated that the constitutional guarantee would be so limited.

In fact, our more recent case law rejects just such a reading of Article I, section 17. In *M. K. F. v. Miramontes*, 352 Or 401, 287 P3d 1045 (2012), we expressly rejected the notion that the right to a jury trial is limited to claims that existed at common law at the time of the framing of the constitution. To the contrary, we held that the guarantee applies to all "claims or requests that are properly categorized as 'civil' or 'at law.'" *Id.* at 425. Only if a claim, standing alone, is "equitable in nature and would have been tried to a court without a jury at common law," does the guarantee not apply. *Id.*

Obviously, there is some tension between what this court said and did in *Hughes* and what we said and did in *Foster*.

It strikes me that there are two possible ways to resolve that tension. First, we could conclude that *Foster*— which did not expressly address the matter—implicitly overruled *Hughes*. Second, we could conclude that *Foster* did not need to overrule *Hughes*, because *Hughes* and its *Smothers*-like analysis apply to only a particular aspect of the right to a jury trial, namely, a right to the benefit of the jury's decision itself without any statutory limitations, and does not apply to the broader question whether there is a right to have the jury make the decision in the first place.

In my own view, only the former possibility is tenable. I do not understand how the right to a jury trial can be parsed out into subsidiary rights, one of which requires *Smothers*-like historical analysis and the other that does not. Either there is a right to a jury trial, or there is not. Plain and simple.

It could be inferred that the court implicitly adopts the second of the two possibilities in this case, given that it has engaged in the historical analysis that *Smothers* and *Hughes* require in deciding the matter under Article I, section 17. I think the inference would be erroneous, however. As the court notes, neither party asks us to overrule *Hughes*. Moreover, because the court concludes that plaintiff's claims

*would* have been recognized at common law, it simply does not need to address whether such analysis is required. Still, the issue is an important one, and deserves to be addressed in an appropriate future case.

I do not argue that we should address all of these issues in this case. Although I would not go so far as to say that we are incapable of reconsidering earlier decisions without a request from one or more parties, I nevertheless recognize that questions such as the ones that I have posed are difficult and complex and that the court, in attempting to address them, would benefit from the sort of research and argument that the adversarial process provides. Careful and vigorous advocacy may reveal that I am mistaken in my critique of *Smothers* and *Hughes*. Or not. Either way, before we apply those decisions in future cases, we should invite such advocacy to address the issues that I have raised.